[S. F. No. 21863. In Bank. June 2, 1965.]

LEWIS JOHNSON YAPP, JR., Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Richard Gladstein for Petitioner.

F. LaMar Forshee for Respondent.

THE COURT.—Lewis Yapp, Jr., seeks a review of a Board of Governors' recommendation that he be suspended from the practice of law for three years, one year actual, and the last two years on probation, subject to conditions.

Petitioner was admitted to practice in January 1951. Since 1958 he has practiced in Santa Cruz. He has no prior disciplinary record.

The State Bar charged and found that petitioner mishandled $18,000 deposited with him as escrow agent in connection with the purchase and sale of a tavern and liquor license. The charge and findings are supported by the weight of the evidence.

The background of this transaction is as follows: Joyce and William Gamblin, while married, in 1959 acquired the Club Del Mar in Santa Cruz, and possessed in both their names a general on-sale liquor license in connection therewith. Part of the funds for the purchase of this tavern were secured by mortgaging a lot owned by Mrs. Gamblin.

In 1960 the Gamblins separated, and in September of that year entered into a property settlement agreement by which this mortgaged lot was to go to Joyce, and William agreed to pay the $4,700 still owing on the note secured by the lien on the lot. William also agreed to pay to Joyce $5,400 at the rate of $150 a month, starting in October 1960, and to pay all the debts of the tavern. An interlocutory decree of divorce was filed September 29, 1960, which incorporated and approved the property settlement agreement.

William did not carry out the terms of this agreement, and Joyce, in June of 1961, retained petitioner to try to collect from William some of the money due her under its terms. In this petitioner was not entirely successful, but he remained the attorney for Joyce until after the events about to be described. During this period, petitioner became acquainted with both the Gamblins and with the general operation of the tavern. Among other things, he knew that William owed Joyce considerable money, that there were substantial creditors of the tavern, and that both William and Joyce were named in the liquor license.

Early in June of 1962 the tavern was closed by the Internal Revenue Service because of unpaid taxes.

The tavern, then closed, was sold to Paul Starcevich on June 15, 1962. Starcevich was an experienced bar operator

and had a clean record with the Department of Alcoholic Beverage Control. He had no doubt that he could secure the approval by that department of the transfer of the liquor license, and did in fact receive such approval on August 27, 1962.

The Gamblins and Starcevich, prior to June 15, 1962, had agreed on a price of $18,000 for the tavern and license. Just prior to that date they came to the office of petitioner and retained him to draft the necessary papers. He prepared an escrow agreement, naming himself, at the suggestion of the parties, as escrow agent. He also prepared a "management agreement" and a bill of sale. These documents were signed by the principals, and the escrow agreement was signed, in addition, by petitioner, on June 15, 1962. Prior to that date Starcevich had secured an agreement with the landlord of the tavern for a lease in his name and had opened a Club Del Mar bank account.

The escrow agreement named the Gamblins as transferors, Starcevich as transferee, and petitioner as escrow agent, and stated that pursuant to the regulations of the Department of Alcoholic Beverage Control the parties desired to enter into a bona fide escrow. It required Starcevich to deposit with the escrow agent $18,000 as the full purchase price for the tavern and license. It was noted that there was a government tax lien on the premises and the escrow agent was directed to pay off that lien. A representative of the Internal Revenue Service was present in the attorney's office on June 15, 1962, when this agreement was signed, and agreed to its terms. The agreement then provided that the escrow agent should hold all of the funds deposited with him "for the benefit of Transferors, and the creditors of said Transferors" until the liquor license was transferred to Starcevich. The escrow agent was instructed to pay all the bona fide claims of the creditors of the transferors who filed their claims before the license was transferred, and, if the $18,000 was not sufficient to pay all such claims, to prorate them. The escrow agent was directed to pay such claims within a reasonable time after the license was transferred, and was directed to withhold $1,000 from the escrow for 30 days after close of the escrow to pay expenses of the transferee in complying with building code requirements. Any balance after paying the creditors and withholding the $1,000, was to be distributed $6,500 to Joyce Gamblin and the balance, if any, to William.

Upon execution of this agreement Starcevich gave the peti-

tioner a check for the $18,000 drawn on his recently opened Club Del Mar account. Petitioner, on the same day, deposited this check in his trust account, as part of a $31,500 deposit.

As already pointed out, at the time this agreement was executed, petitioner knew that the tavern had creditors including the federal and state governments, knew that William Gamblin was delinquent in his payments to Joyce, knew that Joyce had a financial interest in the escrow and that she was one of the licensees named in the license. Petitioner also knew that Starcevich had a financial interest in the escrow and was interested in having all creditors, including the governments, paid.

Starcevich wanted to commence operations as soon as possible. To accomplish this, and so he could operate the bar before the transfer of the license to him, the parties executed a management agreement under which Starcevich was to operate the bar until such transfer was approved as the "manager" of the club, purportedly on behalf of the Gamblins. In fact, after Starcevich opened, shortly after June 15, 1962, he operated as if he were the owner, buying and paying for all the necessary liquor and equipment. The lease to the premises was then in his name. He made all decisions. Joyce Gamblin continued to work at the bar and was paid a salary for her services. Starcevich had a bill of sale to the premises and its equipment signed by the Gamblins. Late in June and thereafter Starcevich excluded William Gamblin from the premises.

On June 18, 1962, petitioner, the Gamblins and Starcevich went to the office of the Department of Alcoholic Beverage Control in San Jose and filed the proper documents to secure a transfer of the liquor license.

On June 20, 1962, William Gamblin visited petitioner at his office in Santa Cruz. Petitioner was then hard pressed for cash and Gamblin became aware of that fact. The two talked this problem over, and then William Gamblin signed and delivered to petitioner the following document written on the letterhead of petitioner:

"June 20, 1962. Lew Yapp has my permission to use all or any part of the money he is holding in the Club Del Mar Escrow as a loan to be repaid within fifteen (15) days after I demand it be repaid.

Bill Gamblin"

Starting on June 20, 1962, petitioner began writing personal checks on the trust account. By June 25, 1962, the balance was

$15,598.11. On July 25, 1962, it was reduced to $11,278.11, while by August 15, 1962, it had shrunk to $15.15.

Apparently out of his personal funds, petitioner paid some of the claims. The first payment was made on August 24, 1962, to the State Board of Equalization as security for the Gamblins' sales tax liability.

On August 27, 1962, the transfer of the liquor license was approved, but petitioner took no steps to close the escrow. On April 30, 1963, petitioner paid the claim of the Internal Revenue Service.

In the meantime, the creditors of the tavern, Starcevich, and Mrs. Gamblin were getting restive. Mrs. Gamblin made many attempts to get some action on the escrow from petitioner or to get information about it, but was unsuccessful. She had married a Mr. Pasley in November 1962 and moved out of California. In the early months of 1963 she retained another Santa Cruz attorney to try to learn from petitioner why the escrow was not being closed. After some difficulty in reaching the petitioner, this new attorney met with him on May 6, 1963. He testified that petitioner then told him that ''he had spent all the monies except $4,000, and the $4,000 had been paid to the State Board of Equalization and the Internal Revenue Service.''

Petitioner partially paid off the remaining claimants over a long period of time. Claims against the escrow by some 52 creditors totaled $24,071.77. Some creditors (the taxing agencies) were paid in full, others paid 70 cents on the dollar. These were all paid out of funds other than the trust fund. Petitioner's total payments amounted to $18,853.97. Thus petitioner paid out to the creditors more than he received. in the escrow, and he charged no fee for his services.

During the period that Joyce Gamblin and other creditors were trying to get action on the escrow, petitioner made various false representations to Mrs. Gamblin and to some of the other creditors and to their attorneys as to the status of the escrow.

In 1963 petitioner was indicted and charged with grand theft based on the transactions here involved. After trial by jury, in April of 1964, he was acquitted.

These disciplinary proceedings were instituted on November 21, 1963. Hearings were had before the local administrative committee in February of 1964. Petitioner sought, ineffectively, to have the hearing postponed until after his trial on the criminal charge, which was then pending. After the com-

mittee had filed its findings, conclusions and recommendation, petitioner sought to secure a trial de novo before the Board of Governors on the ground that the record in the criminal case, which had been tried after the committee's report, contained evidence not before the committee. The Board of Governors denied the request for a trial de novo, but granted the request for the taking of additional evidence by permitting the filing of the transcript of the criminal trial. Thus, there are two transcripts, both considered by the board, that is the transcript of the hearing before the administrative committee, and the transcript of the criminal trial.

The administrative committee found that petitioner had knowingly misused the money in the escrow and recommended a flat three-year suspension. The board adopted the findings of culpability, and by a vote of thirteen to one recommended three years' suspension, one year actual and two years on probation subject to conditions. The member in the minority favored a shorter period of actual suspension.

There can be no doubt that petitioner was acting as attorney for the three parties, that he was a fiduciary, and that he took and used funds entrusted to him without the consent of all of the interested parties.

The escrow agreement, which he had drafted, imposed upon him certain duties owed to all three of the participants and to the creditors of the tavern. He knew that William Gamblin was in default in his payments to Mrs. Gamblin, and that the agreement conferred on her some very substantial rights. He knew that the agreement conferred important rights upon the buyer of the tavern. He knew that there were substantial creditors including the tax lien claimants. He knew that the law requires an escrow upon the sale of a tavern, and that such escrow is required for the protection of all concerned. Under these circumstances, during the period of escrow, he took for his own use the entire $18,000 entrusted to him. He did this without the permission of Mrs. Gamblin, or of Starcevich, or of the creditors or of the tax lien claimants. His sole authority for thus diverting the funds was the authorization given to him by William Gamblin, an important, but by no means the only, interested person.

The purpose of the escrow was frustrated for some time. It is true that such purpose was ultimately consummated with funds supplied by petitioner. No one suffered a money loss by defendant's actions, but many persons did suffer a delay in receiving their money. Under such circumstances,

the claim that the loan agreement, signed by William Gamblin alone, authorized him to withdraw the funds has no merit, as is likewise true of the claim that in any event the record shows he acted in good faith.

■ It hardly needs citation of authority to sustain the proposition that it was an improper act for petitioner to use the trust property for his own purposes. It was his duty to segregate the funds and keep them separate from his own.

■ While a beneficiary may consent to what otherwise would be a breach of trust, and William Gamblin did so consent, where, as here, there are several beneficiaries, the consent of one does not bar the nonconsenting beneficiaries from claiming a breach of trust.

■ His claim of good faith in "borrowing" the $18,000 is not credible. Petitioner's conduct after he borrowed the money was evasive and deceitful, culminating in his statement to an attorney and to Mrs. Pasley that he knew he had done wrong in using the money for his own purposes. Certainly he was evasive and untruthful in his explanations to Mrs. Pasley. When she felt compelled to secure an attorney to investigate, petitioner obviously tried to avoid the attorney, and then finally admitted to the attorney that he had spent all but $4,000 of the money. The next day petitioner repeated the statement to Mrs. Pasley in the presence of her mother-in-law and her new attorney, petitioner telling them that he had spent the money to pay his own income tax and would try to get a loan to cover what Mrs. Pasley was out. Petitioner then stated that "he appreciated it was the wrong thing to do" but if she went along with him the money would be returned, but that if she reported the matter to the authorities she would lose any chance of recovering the money. Mrs. Pasley testified that the words of petitioner were: "I know it was wrong but I spent the money for my own personal use. I was in a bind and I needed it and I spent it. I know it was wrong. . . . If you will leave me alone so I can finish my practice and have my practice, I can make restitution to you. If you place a complaint, then you will never get anything, because I will . . . lose my license."

Petitioner, either at the administrative hearing or the criminal trial, admitted that he had lied to the new attorney for Mrs. Pasley as to the status of the escrow, and to the attorney for the Board of Trade, trying to stall them.

Petitioner's major contention is that on June 15, 1962, the parties were seeking to consummate an immediate transfer

of the tavern and that the purpose of the escrow was consummated before June 20, 1962, when the loan agreement was consummated. Thus he claims that William Gamblin was the owner of the $18,000 and had the right to loan it to him, or, if he did not, he, the petitioner, in good faith thought he had.

Certainly there is no evidence at all that the former Mrs. Gamblin or Starcevich waived, rescinded, modified or canceled the terms of the agreement. It is true that petitioner testified that the management agreement was known to all to be but a formality and a legal subterfuge, to comply with the law so that Starcevich could operate during the period a transfer of the liquor license was being sought. It is also true that after Starcevich opened the tavern he operated it as if he were the owner and exercised the powers of a proprietor. It is also true that even before June 15, 1962, Starcevich had negotiated a new lease, and opened a bank account in his name for the Club Del Mar. He was given a bill of sale on June 15, 1962, for the equipment and property in the tavern. But a mere reading of the escrow agreement, and petitioner not only read it but drafted it, shows that Mrs. Gamblin and Starcevich had a continuing real interest in the $18,000. The agreement specifically provided for the protection of those interests. Certainly Mrs. Gamblin, even if she knew that Starcevich was owner of the bar except in name only, did not waive her interest in the $18,000. Everyone knew the tavern had major creditors. Certainly Starcevich was not going to accept final transfer of title until those creditors and lien claimants were paid, and until he secured a transfer of the liquor license.

It is true that petitioner was charged with grand theft based on his activities in this transaction, and that after trial by jury he was acquitted. But, although important, that fact is not conclusive on this court. This court must exercise its own judgment on the facts here involved. As was said in *Best* v. *State Bar,* 57 Cal.2d 633, 637 [21 Cal.Rptr. 589, 371 P.2d 325]:

"It is apparent that the purposes of the two proceedings are vastly different. A criminal proceeding has for its purpose the punishment of the accused if he is found guilty. A disciplinary proceeding against an attorney is not intended for his punishment, but is for the protection of the public, the courts, and the legal profession."

Thus there is no doubt that petitioner has been guilty of reprehensible conduct warranting discipline. The only

question is whether the three-year suspension, one year actual, and the balance on probation, is excessive.

There are certain factors that should be considered in favor of petitioner.

1. He ultimately paid out more than $18,000, and charged no fee. No one was financially injured, although many persons were delayed in collecting.

2. Petitioner does not have a prior disciplinary record.

3. He was acquitted of the criminal charge.

4. He did have the loan agreement from William Gamblin which purported to give him the right to borrow the money, and Mr. Gamblin was one of the main principals.

The factors that weigh against petitioner have already been set forth, *supra*. The misuse of escrow or trust funds by an attorney is a serious matter. Disbarment has on occasion been imposed for such a misappropriation. In *Dreyfus* v. *State Bar*, 54 Cal.2d 799 [8 Cal.Rptr. 469, 356 P.2d 213], there was a misappropriation and the attorney had a prior disciplinary record. In *Stanford* v. *State Bar*, 15 Cal.2d 721 [104 P.2d 635], the attorney took advantage of an aged and trusting client. In *Laney* v. *State Bar*, 7 Cal.2d 419 [60 P.2d 845], the attorney borrowed money from a probate estate without securing court approval, gave worthless security for the loan and generally imposed on an elderly and unsuspecting client.

On the other hand, in *Flaherty* v. *State Bar*, 16 Cal.2d 483 [106 P.2d 617], the court affirmed a recommendation of the board for a one-year suspension. There the attorney had a prior disciplinary record and there was a conversion of funds in breach of a fiduciary relationship, coupled with misrepresentations. In *Di Gaeta* v. *State Bar*, 59 Cal.2d 116 [28 Cal. Rptr. 305, 378 P.2d 577], a board recommendation of six months' suspension, three actual and three on probation subject to conditions including restitution of the converted funds, was affirmed where the attorney had converted $1,750 belonging to his client.

In *Schullman* v. *State Bar*, 59 Cal.2d 590 [30 Cal.Rptr. 834, 381 P.2d 658], only probation was imposed. The board had recommended a one-year suspension. This court reduced this to three years' probation subject to conditions, with no actual suspension. There, although the basic findings of the board were found to be supported, some findings were held to be unsupported. The attorney had borrowed money from his clients giving worthless security, and then, after he had

assigned certain expected fees to his clients, retained most of those fees when they were paid to him. The court stated that one year's suspension would be warranted but reduced it to three years' probation because of what it found to be extenuating circumstances.

Obviously, there is no conformity as to punishment ascertainable from the cases. Each case must be decided on its own facts. In the present case petitioner has certainly committed a serious and reprehensible act of misconduct. But, as already pointed out, there were extenuating circumstances. While a one-year actual suspension and two years on probation could be justified, we think, in view of the fact that this is petitioner's first offense, and the other extenuating circumstances, that no useful purpose would be served by ordering, and the public interest does not require, a full year's actual suspension. We think that the public interest would best be served by suspending petitioner for three years, the first 90 days actual suspension, as was done in the *Di Gaeta* case, and the balance of the period on probation subject to conditions.

It is therefore ordered that Lewis Johnson Yapp, Jr., be suspended from the practice of the law in the State of California for three years; that execution of this order is stayed, and petitioner placed upon probation for said three years, upon the following conditions:

1. That during the first 90 days of said period of probation he shall be suspended from the practice of law in California;

2. That during the period of probation, he shall comply with the provisions of the State Bar Act and Rules of Professional Conduct of the State Bar of California;

3. That during the period of probation, he shall report not later than the tenth day of each month in writing to the San Francisco office of the State Bar of California certifying:

(a) In his first monthly report, that he has read the State Bar Act, Rules of Professional Conduct of the State Bar of California and Canons of Professional Ethics of the American Bar Association; and, if he is in possession of clients' funds, that he has established a proper depositary for such funds (describing the nature of such depositary), and that he has fully and correctly accounted for all such funds;

(b) In each subsequent monthly report, if he still is in possession of clients' funds or, where entitled to practice law, has come into possession thereof during the period covered by the report, that he has a depositary for such funds (describing the nature of such depositary), and that he has fully

and correctly accounted for all such funds; and that he has complied with all provisions of the State Bar Act and Rules of Professional Conduct of the State Bar of California during said period;

4. That at the expiration of said probation period, if he has complied with the terms of probation, this order of the Supreme Court suspending respondent from the practice of law for a period of three years shall be revoked and shall be of no further effect.

The probation period shall commence 30 days after the filing of this order.