[L. A. No. 29421. In Bank. Nov. 6, 1967.]

LOUIS MOST, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Louis Most, in pro. per., for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

THE COURT—This is a proceeding to review a recommendation of the State Bar of California that Louis Most be suspended from the practice of the law for three years, with actual suspension during the first two years, and that he be placed on probation for the entire three-year period.

The findings of the State Bar disciplinary board, made after extensive hearings conducted by a local disciplinary committee, were as follows: Petitioner was admitted to practice in 1934. He was also a licensed insurance adjuster and operated a business under the name of Associated Fire Adjusters (hereinafter called Associated) in addition to his law practice. David Merl suffered a fire loss in his retail shoe store in Oxnard on May 19, 1962, and his accountant recommended that Merl employ petitioner to prosecute his claim against the insurance companies covering the loss because petitioner was licensed both as an attorney and as an adjuster. On June 9, petitioner and Merl entered into a written contract on a printed form furnished by petitioner. The agreement provided that Merl employed Associated as a fire adjuster for a "fee of ten per cent (10%) of the amount paid or agreed to be paid by the insurance carriers in settlement of the loss and expenses."[1]

Merl was insured against fire loss by three separate carriers. Utah Home Fire Insurance Company (hereinafter called Utah) insured his inventory for $40,000, Royal Exchange Insurance Company (hereinafter called Royal) carried insurance of $2,500 on his store fixtures, and Lloyds of London (hereinafter called Lloyds) insured him for $5,400 against the interruption of his business. The carriers suspected Merl of arson and refused to indemnify him for the losses suffered, and on November 9, 1962, petitioner filed an action on behalf of Merl against the carriers.

---

[1]The agreement also provided, "The Assured further authorizes the ASSOCIATED FIRE ADJUSTERS to sign all proofs of loss, and their name shall appear as payee with the Assured on all drafts on said loss."

Merl was unable to pay his creditors after the fire. He requested petitioner to attempt to placate them pending settlement, and petitioner dealt with the creditors both before and after suit was filed. Merl owed Samuels Shoe Company $3,079.40, and on January 29, 1963, he assigned the proceeds of any future settlement from Utah to Samuels in the amount necessary to satisfy its claim. The written assignment gave petitioner a power of attorney to indorse drafts and checks on behalf of Merl to the extent necessary to effectuate the assignment.

Eventually the pending litigation was settled by Merl and the carriers, and on May 20, 1963, he executed releases of his claims against them upon the payment of $32,000 by Utah, $2,000 by Royal and $2,000 by Lloyds. In addition, the settlement provided that Merl could retain $9,000 received from the sale of salvaged inventory which previously had been claimed by the carriers.

Petitioner maintained two trustee accounts; one in his capacity as an attorney and another in the name of Associated. In June 1963 he received two checks for $2,000 each, payable to Merl and to petitioner as his attorney, in settlement of the claims against Royal and Lloyds. He failed to promptly report the receipt of the check covering the Royal settlement to Merl and held it without his knowledge and consent until July 22, 1963. He deposited the Lloyds check in his attorney's trustee account without the knowledge, consent, authority or indorsement of Merl, and did not send him a check for the amount of the Lloyds settlement until August 1963.

On June 19, 1963, petitioner received a check for $30,538.18 from Utah in favor of "David Merl and Louis Most as his attorney."[2] He indorsed the check, signing Merl's name in disguised handwriting, for the admitted purpose of deceiving the drawer and drawee to believe that Merl had indorsed it. The receipt of this check was not promptly reported to Merl. Petitioner deposited it in his Associated trustee account and withdrew all the funds from that account by October 4, 1963, except $317.48. The only amount paid out on Merl's behalf was a check for $3,079.40 to Samuels Shoe Company, pursuant to the assignment. Prior to the deposit of the Utah check the balance in the trustee account was $9.13. The board con-

[2] This sum represented the $32,000 settlement due from Utah less $1,461.82, deducted to pay one of Merl's creditors which had levied a garnishment of the settlement funds against Utah.

cluded that petitioner had misappropriated for his own use $23,550.43 belonging to Merl.[3]

At the hearing it was shown that two creditors of Merl, Pierre Shoes, Inc. (hereinafter called Pierre) and Portage Shoe Manufacturing Company (hereinafter called Portage) attempted to secure payment of Merl's debts out of the proceeds of the insurance settlement. They both contacted petitioner after he received the check from Utah, requesting the payment of their claims but petitioner did not inform them that the settlement funds had been received. He failed to answer a letter from Pierre asking the amount of the settlement and when payment of its claim might be expected. In August 1963 Portage contacted petitioner twice regarding payment of its bill and petitioner finally replied on August 12, stating that the claim would be paid by his office and that Portage would be hearing from him shortly. However, no payment was sent.

Merl testified that he telephoned petitioner constantly between June and October 1963 regarding the whereabouts of the settlement money, that petitioner told him he had not received it yet, and that "it takes 120 days." Petitioner contradicted this assertion, stating that he had told Merl on or before July 9 that all the settlement funds had been received.

Jack Berkowitz, Merl's general attorney, testified that Merl asked him several times during the summer why the insurance companies had not yet sent the money and on each occasion Berkowitz reassured him, stating that there was nothing to worry about. On October 4, at Mrs. Merl's insistence, Berkowitz telephoned representatives of the insurance companies and was told that payment had been made to petitioner the previous June. Berkowitz telephoned petitioner, and a meeting was arranged for October 7.

Berkowitz, the Merls, and petitioner met in Berkowitz's office on that day, and petitioner submitted a statement of account showing that he owed Merl only $10,791.90. This statement indicated that he was claiming a total of $4,500 in fees, representing 10 percent of the $36,000 settlement and the $9,000 retained by Merl as proceeds from the salvage of the inventory. Petitioner also deducted from the amount owing to

[3]This figure is calculated by adding to the $30,538.18 received from Utah the amount in the Associated account before the Utah check was deposited ($9.13) and deducting therefrom the payment to Samuels Shoe Company ($3,079.40), petitioner's fee ($3,600) and the balance on hand after the withdrawals had been made from the account ($317.48).

Merl the payment made to Samuels Shoe Company pursuant to the assignment and purported payments to Pierre, Portage, and Merl's accountant. Merl pointed out, however, that neither Portage nor Pierre had been paid and that he had paid the accountant himself. According to Berkowitz and Merl, petitioner indicated that he had $12,000 in his trustee accounts and would pay this sum to Merl by cashier's check the next day. He also consented in writing to pay a total of $32,159.18 to the Merls by October 10 and to leave to their discretion whether he would be paid the 10 percent fee previously agreed upon. At the time of the conference petitioner had $317.48 in the Associated trustee account and $1,352.39 in his attorney's trustee account.

On October 8 petitioner borrowed $4,500 from a bank, deposited the loan proceeds in his Associated account, and gave the Merls a check for $4,000 drawn on that account. On the same day he wrote Berkowitz stating that if the Merls insisted, he would pay the $32,159.18 agreed upon in the previous day's conference but that, according to a revised accounting statement which he enclosed, he should pay only $23,787.24. [4]

Another meeting was held on October 9 at which petitioner, Merl, and the latter's wife and son were present. At that time petitioner paid Merl $1,000. Petitioner testified that Merl demanded exemplary damages of $50,000 or $55,000 and threatened that he would report petitioner to the police if he did not pay it. Merl denied this and testified that petitioner voluntarily offered to pay damages of $55,000 in addition to the $32,159.18 previously agreed upon. At Merl's insistence, they telephoned Berkowitz and told him that they were discussing a settlement in the vicinity of $50,000. Berkowitz informed them that if this sum was agreeable to Merl and petitioner it was all right insofar as he was concerned but he advised Merl to obtain a note signed by petitioner and his wife for the amount of the settlement. Petitioner delivered to Merl a note for $55,000, which with the $32,159.18 previously agreed upon, amounted to a total of over $87,000 in damages.

Petitioner paid $7,316.20 to Pierre on October 23. Thus, the total amount of restitution paid to Merl and his creditors was $12,316.20. Merl filed a civil action against petitioner on Octo-

---

[4]In the revised statement petitioner claimed credit only for the amount paid to Samuels Shoe Company and the two $2,000 checks sent to Merl, $4,500 in fees and $72.55 in costs, and offered to pay $401 in interest to Merl and $500 in attorney's fees to Berkowitz.

ber 18 in an attempt to recover the balance due him, claiming $18,858.78 in compensatory damages and $100,000 in exemplary damages. ██ Judgment in the civil action was in favor of Merl and an appeal by petitioner is pending.[5]

At the hearings before the disciplinary committee petitioner attempted to explain his withdrawals from the Associated account. He claimed that he believed he was entitled to $15,000 in attorney's fees and that he attempted to approximate this sum in the amounts he removed from the account from time to time.

A dispute existed between petitioner and Merl as to whether the 10 percent contingent fee agreed upon between them was to include legal services. Merl testified that at the time the agreement was consummated petitioner had represented that the fee would cover all necessary legal services, in addition to fire adjusting services, but petitioner denied that legal fees were discussed at the time the contract was signed. He claimed that he was entitled to additional compensation for legal services and that in July 1962 he was assured by Berkowitz that a reasonable contingent fee would be paid. Between January 29, 1963, and May 20, 1963, petitioner and Merl discussed the question of legal fees but Merl refused to agree to pay more than the 10 percent set forth in the written contract. This dispute was not resolved, and petitioner was aware of the existence of a disagreement on the subject.

The board found that petitioner was not authorized to withdraw more than $3,600 in legal fees from the settlement proceeds.[6] It also found that he did not believe at the time he withdrew the funds from the Associated account that a fee in excess of this amount had been agreed upon or that he was authorized to appropriate more than this sum for his fee. These findings were based upon petitioner's knowledge that

[5]Petitioner urges this court to review not only the State Bar disciplinary proceeding but also the appeal now pending before the Court of Appeal in the action filed by Merl. The record in the civil case is not the same as that involved in the instant disciplinary proceeding; the purpose of the two actions is different; and disciplinary action against petitioner, if justified by the present record, would be appropriate even if the Court of Appeal reverses the judgment in favor of Merl in the civil case. Thus, there is no justification for transferring the appeal to this court.

[6]Petitioner claims that the 10 percent contingency fee contract entitled him to a $4,500 fee rather than the $3,600 found by the committee. We need not discuss this issue since, even if petitioner is correct in his argument, it would have no bearing on the question whether he misappropriated the money but would only diminish the amount misappropriated by $900.

the question of fees was in dispute, on the pattern of frequent withdrawals from the Associated trustee account, on his agreement to pay over $87,000 to Merl without asserting that additional fees were due, and on the fact that he claimed only $4,500 in fees at the time he rendered statements of account on October 7 and 8.

Another assertion made by petitioner to explain the disposition of the settlement funds was that he withdrew $12,000 from the Associated account and placed it in cash in Merl's file in his office in order to protect the money from attachment by creditors, since he had promised them they would be paid. The board found that petitioner did not preserve any cash in his office or elsewhere for the benefit of Merl or his creditors. This finding was specifically based on the facts that although petitioner agreed to pay Merl $12,000 on October 8, he did not pay this amount and was required to borrow money in order to make the $4,000 payment which he did make, that when Merl demanded the proceeds of the settlement on October 9, petitioner did not pay over the balance and did not mention that he was holding cash for the benefit of Merl's creditors in his office, and that petitioner signed a promissory note for $55,000 in Merl's favor on October 9, an amount far in excess of what he owed.

Petitioner had no canceled checks, check stubs, account books, or memoranda to indicate the dates that withdrawals were made from his trustee accounts or the purpose for which withdrawals were made.

In reviewing disciplinary proceedings conducted by the State Bar we exercise an independent judgment on the evidence and pass upon its weight and sufficiency. The burden is on the petitioner, however, to demonstrate that the findings are not supported by the evidence or that the recommendations are erroneous or unlawful. In meeting this burden, petitioner must demonstrate that the charges are not sustained by convincing proof and to a reasonable certainty.

We resolve all reasonable doubts in favor of the accused and if equally favorable inferences may be drawn from a proved fact, the inference which leads to a conclusion of innocence rather than one leading to a conclusion of guilt will be accepted. (*In re Urias* (1966) 65 Cal.2d 258, 261 [53 Cal.Rptr. 881, 418 P.2d 849]; *Zitny* v. *State Bar* (1966) 64 Cal.2d 787, 789-790 [51 Cal.Rptr. 825, 415 P.2d 521]; *Schullman* v. *State Bar* (1963) 59 Cal.2d 590, 599-600 [30 Cal. Rptr. 834, 381 P.2d 658].)

 Judged by these standards the conclusion that petitioner was guilty of misappropriation is supported by the overwhelming weight of the evidence in the present case. Petitioner received the settlement check from Utah on June 19, 1963. Although he claimed he told Merl prior to October 7 that he had received the funds, his testimony in this regard is so evasive and the contrary evidence so convincing that we are compelled to conclude he failed to report the payment despite frequent inquiries from Merl, and that he did not admit to having received the checks until confronted by Merl and Berkowitz in October, after the latter had been told by the insurance companies that the checks had been mailed to petitioner in June. In the conference of October 7, petitioner misrepresented that he had paid Portage, Pierre, and Merl's accountant. He could not produce records to justify his withdrawals from the Associated account and did not produce the settlement proceeds on demand.

The board was amply justified, on the grounds stated in its findings, in disbelieving petitioner's assertion that he had withdrawn $12,000 of the Utah proceeds from the account and held it in cash in his office for the benefit of Merl's creditors[7] and that he believed he was entitled to $15,000 as his fee and withdrew this sum from the settlement proceeds in satisfaction thereof. Petitioner was guilty of serious misconduct even if we accept his dubious assertion that he withdrew $15,000 of the settlement funds in payment of what he considered to be a proper fee. While petitioner may have been justified in concluding that he should have been paid more than a 10 percent fee, no more than 10 percent had been agreed to by Merl. An attorney may not unilaterally determine his own fee and withdraw funds held in trust for his client in order to satisfy it, without the knowledge or consent of the client.

 In addition to misappropriating over $20,000 of Merl's funds, petitioner failed to keep proper records to indicate his disposition of trust funds (see *Clark* v. *State Bar*

[7]Petitioner argues that the fact he borrowed $4,500 on October 8, and paid $4,000 of the proceeds to Merl does not militate against his claim that he had secreted $12,000 in cash in his office for the benefit of Merl's creditors. He contends that he borrowed the money because he felt certain that Merl would demand more than $12,000 from him and he wished to be prepared to meet such demand. This claim is not worthy of discussion in view of the fact that petitioner did not pay even $12,000 to Merl on October 8, as he had promised to do and, according to petitioner, he promised to pay over $87,000 because Merl had threatened to report him to the police.

(1952) 39 Cal.2d 161, 174 [246 P.2d 1]) and failed to promptly report or transmit any of the checks received from the insurance companies on account of the settlement, in violation of rule 9 of the Rules of Professional Conduct.[8]

The board stated in its findings that the determination of the value of petitioner's legal services was irrelevant to the disciplinary proceeding but that he did perform substantial legal services in connection with the fire loss.[9] Petitioner maintains that the board erred in refusing to determine the value of his legal services. The conclusion that petitioner was guilty of misconduct, insofar as the withdrawal of $15,000 for purported legal fees is concerned, rests on the fact that Merl had agreed to pay as legal fees only 10 percent of the recovery, that petitioner was aware of this, and that he was authorized to retain only this percentage as his fee. The question whether his services were in fact worth more than the agreed fee is, therefore, irrelevant. Although petitioner claims that the board erred in finding that the written agreement was the sole fee arrangement entered into between the parties, he cites no evidence to the contrary.

Petitioner makes a series of contentions relating to the $12,000 he asserts he withdrew from the Associated account and held in cash in his office for the benefit of Merl's creditors. He claims that Merl at first gave him full authority to deal with the creditors and, relying on this authorization, petitioner promised the creditors payment of their bills in the amounts submitted by them, that after petitioner had made these promises of payment Merl withdrew his authority to deal with the creditors, and that petitioner refused to pay over the settlement funds to Merl because he had promised the creditors they would be paid.

In view of the overwhelming evidence that petitioner did not hold $12,000 of the settlement proceeds in the form of cash in his office or any place else for the benefit of creditors, the question whether he felt himself personally liable to the creditors is irrelevant to the determination that he had misappropriated the settlement funds. Moreover, there is no satisfactory explanation in the record as to why petitioner did not

---

[8]Rule 9 provides in part that an attorney ''shall promptly report to the client the receipt by him of all money and other property belonging to such client.''

[9]In June 1962 Merl also engaged petitioner to represent him in prosecuting a claim for water damage to Merl's home. No fee agreement was entered into relating to the water damage claim and petitioner received no compensation for his services in this connection.

pay the money to the creditors upon their persistent demands for payment, if in fact he withheld the money for this purpose.

We cannot believe that petitioner, in order to fulfill a promise to creditors, would refuse to pay over settlement money purportedly held in cash in his office despite his client's demand that the funds be paid, and despite charges that petitioner had stolen the funds and that he even consented to pay $87,000 in damages on a claim he believed to be only $23,787.24. Petitioner's entire testimony with regard to the disposition of the money held in trust for Merl is evasive and in some respects patently false.[10] and the record strongly supports the charges of misappropriation.

*In re Urias* (1966) *supra,* 65 Cal.2d 258, 262, stated, "Misappropriation of funds entrusted to an attorney at law is a gross violation of general morality as well as professional ethics and, in addition, is likely to endanger the confidence of the public in the legal profession. It deserves severe punishment." Here, petitioner not only misappropriated funds held in trust for his client, but was guilty of misconduct in other aspects of this sordid situation as well. His conduct clearly justifies the discipline imposed.

It is ordered that petitioner be suspended from the practice of law for a period of three years; execution of this order is stayed and petitioner is placed on probation for said period of three years upon the conditions prescribed by the board in this matter, including actual suspension from practice for the first two years thereof. This order to be effective 30 days after the filing of this opinion.

Petitioner's application for a rehearing was denied December 6, 1967.

---

[10]Petitioner continually reiterated during his testimony that the $4,000 paid to the Merls on October 8 came from the $12,000 in cash purportedly held in his office. The manager of a bank testified that on October 8 petitioner had contracted a loan of over $4,500, and petitioner thereafter admitted that the money paid to the Merls on that date was paid from the loan proceeds and not from any money kept in his office.