[L.A. No. 29636.   In Bank.   July 30, 1970.]

DALE EINHORN LEE, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

Richards, Watson & Hemmerling, Clifford A. Hemmerling and Joseph P. Myers for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

OPINION

**THE COURT.**—This is a proceeding to review a recommendation by the State Bar Disciplinary Board that petitioner be suspended from the practice of law for a period of three years on conditions of probation, including actual suspension during the first year.

Petitioner was admitted to practice in this state on January 9, 1962. In late 1964 he was engaged as an attorney by Brink's, Inc., to collect a debt from Economic Services, dba Walker Oil Company. He was also engaged as an attorney and/or business adviser by William Walker, president of Economic Services and president or primary responsible party of one or more corporations or proprietary business enterprises owned or controlled by him.

Brink's contract with Economic Services required them to pick up cash at service stations and deliver it to designated persons. When they were told to cease performance they had in their possession as bailee many bags of money; they were owed $4,476.48 in unpaid charges; and the authorized recipient of the money could not be found. They employed petitioner as their attorney in this matter. He negotiated with Walker, as president of Economic Services, for the retention by Brink's of $2,425.98 of the monies held in bailment and a confession of judgment for the balance of $2,809.50, which included $250 interest and $500 attorney's fees. Petitioner included a provision in the confession of judgment that it might be entered against Walker and Economic Services "jointly and severally" but this phrase was deleted by Milton Musser, attorney for Walker. Petitioner claims that he did not know at that time that Walker was the sole stockholder and a director of Economic Services. Petitioner agreed not to file the confession of judgment for 60 days. On November 23, not having received any further payments he filed it as an action in the Los Angeles Municipal Court, and thereafter recorded it in various counties. In October he had received $250 from Brink's for his services to date. He agreed that his fee would be $200 for collecting the balance if court action was not required.

Sometime before November 19, 1964, petitioner met with Walker to discuss the Brink's debt. Walker stated that he owed a lot of money and was cash short, that he was involved in a multi-million dollar lawsuit, and that if petitioner could help him find someone to buy some of the gas stations or to lend him money he would pay off Brink's as soon as he got the money and that he would pay petitioner for his trouble. There was no specific agreement as to fees. Walker said "I will take care of you." Petitioner knew that Walker had cash or access to cash; that he was "operating out of his pocket and under three or four different names"; that when dealing with Walker "you don't know what entity he represents"; and that Walker used "such phrases as 'we are going to' and you never know who the 'we' or 'I' is, whether Economic Services or someone else." Petitioner insists that "to this day I don't know who was which and on what deal." Nevertheless he determined that the best way to get money for Brink's was not by direct pressure on Walker but by working along with him. He had already determined that it was going to be difficult to collect from the company. Walker had told him that it had no cash, was out of business, and the gas stations were shut down. The telephone was answered by an answering service. Petitioner did not know of any assets or any way of getting money out of the company.

On November 27 Brink's credit manager in Chicago requested John W. Jones, Pacific Coast Manager for Brink's, to report on the status of the debt. Jones contacted petitioner and reported to Chicago that petitioner was working with the attorney for Walker Oil in an attempt to collect the amount owed without the expense of going to court. On January 20, 1965, petitioner advised Jones that he had collected $500 from Walker which he would remit when the check cleared; that he was pushing for more each week; and *that the receipt of this money in no way slowed down his efforts to enforce the judgment*. On February 2 he forwarded to Brink's his check for $1,000, indicating that he expected another payment soon. On March 31 he forwarded a photostat of a $500 check drawn by Aloha Oil Company in his favor and signed by Walker. It had been returned by the bank for insufficient signature and he advised Brink's that he would contact Walker regarding it. By implication the check was intended as a payment on the Brink's judgment. Petitioner testified, however, that Walker never intended it for Brink's, and that half of it was given to him for costs in connection with an action filed by him as assignor of Aloha Oil Company (in which Walker owned 81 percent of the stock) at the request of Walker.

On April 20 petitioner advised Jones' secretary that Brink's was involved in a lawsuit not by name but by interest. He did not inform her or Jones that he had filed an action in his own name for an undisclosed principal against a Mr. A. E. Joseph or that he brought that action as the payee of

a $2,000 promissory note and beneficiary of a deed of trust on Economic Services property securing same, executed in his favor by Walker as president of Economic Services on January 23, 1965 (hereinafter more fully discussed). Brink's never authorized him to become a payee of a note, to take a deed of trust, or to bring an action in which they were the undisclosed principal. In May petitioner reported that he was still working on the debt. Jones, therefore, on May 3 advised the Chicago office that petitioner did not feel that it was a lost cause.

On May 5 Brink's received a letter from Harold Rubins, attorney for Joseph, defendant in the civil action, inquiring whether they were the undisclosed principal represented therein by petitioner. Brink's sent the letter to petitioner for reply. What verbal explanation he made of it at that time is not clear. He gave none in writing. On June 3 the Chicago credit manager advised Jones to instruct petitioner not to receive minimum payments and that if he had not received a definite commitment legal proceedings should be instituted as soon as possible. Petitioner replied on June 28 that Walker was involved in three lawsuits, had one escrow opened, and that petitioner felt that all would be paid in 45 days.

Some time between June 28 and August 4, when petitioner obtained for $400 an assignment from Brink's to himself of their judgment, he made some communication to Brink's regarding the note, deed of trust and civil action. The Brink's file was in evidence at the disciplinary hearing. Jones testified that it contained no references to these matters and that he had no personal knowledge of them. Petitioner had avised him that if Brink's stayed with petitioner in his efforts to collect the money then due them (at that point $1,809.50 including interest and attorney's fees), that Brink's would end up collecting somewhere in the neighborhood of $20,000, and Jones had replied that all they wanted was the money due and that they did not want any embarrassment whatsoever in connection with this case. Charles H. Reich, Los Angeles manager of Brink's, testified that petitioner had mentioned something to him "but it was all Greek to me. I didn't know what he was getting at. All I know is he was trying . . . going through certain proceedings to collect our money."

It is pertinent to note here evidence received by two affidavits, filed by petitioner for the first time on petition for review with the disciplinary board, and also filed with this court in this proceedings which relate to oral information given by petitioner to Francis D. Partlan, attorney for Brink's at the time in question. Partlan stated that he acquired knowledge in *August 1965* that petitioner was engaged in litigation concerning a security interest in real property given to him by Economic Services, that

Brink's had told him he was proceeding on behalf of Brink's and that Brink's might realize as much as $20,000 if the action was successful. He stated that he told petitioner that Brink's was only interested in the monies remaining due and would prefer to assign any and all interest they held rather than become involved as principal in the note and security interest or in the litigation. He did not state that Brink's ratified petitioner's actions nor that the assignment should include any interest of Brink's in such note, deed of trust or litigation. The affidavit of Eugene P. Taylor, counsel for petitioner in the Joseph litigation and petitioner's original counsel in these proceedings, confirmed that a telephone call took place between petitioner and Partlan *in July 1965* in which Brink's indicated that they wished to disassociate themselves from any further proceedings and had offered upon payment of a reasonable sum to assign their interest to petitioner. No explanation was made by petitioner or Taylor why this evidence was not produced before the disciplinary committee had concluded its hearings. Attorney Taylor was present at the hearings, had indicated that he had nothing more to offer and had rested, the case was under submission by the committee seven months before it was decided, and the affidavits were filed thereafter.

In July 1965 Jones recommended to Brink's that they sell their judgment to petitioner and that the assignment cover liability for costs or fees due him. The sum of $400 was agreed upon, some or all of which represented reimbursement for costs or fees. Petitioner testified at the hearings that his costs were between $200 and $500. He prepared the necessary documents and forwarded them with his check. The assignment of August 4 contained no reference to the pending litigation or to the note and deed of trust, purportedly held by petitioner as Brink's agent. Petitioner insisted at the hearings that the assignment was intended to convey them to him. No one on behalf of Brink's confirmed this assertion.

Eleven months after the assignment, in May 1966, Walker offered to pay off the Brink's judgment so that he could close an escrow. He asked petitioner if Brink's would discount it. Without disclosing his ownership of the judgment petitioner said that he would inquire. He reported that Brink's was insisting on 100 percent payment. Walker paid him the full $1,800 remaining on the judgment.

The note and deed of trust were obtained under the following circumstances. In November 1964 Walker requested petitioner's assistance with regard to Economic Services property in Pacoima which was under foreclosure. It had been purchased in 1961 from A. E. Joseph. Encumbrances thereon were a first deed of trust in favor of Seaside Oil Company; a purchase money deed of trust in favor of Joseph on which the balance due was about $22,600; a third deed of trust in favor of Aloha Oil Company;

and an attachment lien held by Douglas Oil Company, one of the companies with whom Walker was in litigation, of $341,580.49. The property was valued at $200,000. In October Joseph had filed a notice of default. Walker did not want the foreclosure to take place. Sale date was January 27, 1965.

Walker had offered to reinstate Joseph's loan plus an "under the table" bonus of $2,000 but Joseph had refused on the advice of his attorney. Walker did not want to use his own money to pay off Joseph in full but he was anxious to find someone who could step into the position of Joseph on the second trust deed. One of the principal issues in the disciplinary proceedings was whether the transactions which followed were part of an unlawful and fraudulent scheme in which petitioner participated in order to put someone into the shoes of Joseph so that any foreclosure proceedings then or thereafter taken would result in favor of Walker or Economic Services by the elimination of the third and fourth encumbrances. The testimony of Walker and petitioner is at variance. Petitioner's own explanations have varied continuously.

There is evidence that petitioner knew at that time of the various liens on the property. Also Walker testified that petitioner suggested that Economic Services execute a $2,000 promissory note in his favor, secured by a deed of trust on the property naming him as beneficiary, and that an option to purchase also be given to him; that petitioner would then be in a position as a junior lienholder to make an offer to purchase from the person seeking to foreclose. Walker paid petitioner $200 in cash at that time as attorney's fees on behalf of Economic Services in connection with this transaction. Walker testified that petitioner had not theretofore performed any legal services for the company; that he performed none for Walker personally; that there was no consideration given, or intended to be given, by petitioner for the note, deed of trust or option; and that there was no understanding that petitioner was to apply any of the money received on the Brink's judgment or that he was taking the note and deed of trust on their behalf. Had there been such an understanding at that time he would not have subsequently paid to petitioner the full amount of the judgment. Walker further testified that at all times during which petitioner was beneficiary of the trust and payee of the note that he was acting as an undisclosed principal for Economic Services, and that when the complaints were filed by petitioner in the two actions against Joseph that he was again representing that company as its undisclosed principal.

On January 20, 1965, petitioner recorded the Brink's judgment, and it became a fifth junior lien on this property. On January 22 he recorded his own deed of trust, and it became the sixth lien. Thereafter he telephoned

Joseph, representing himself as an attorney acting for Walker, the owner of Economic Services. He offered to pay Joseph $22,600 for an assignment of the trust deed to himself. Joseph refused. On January 23 petitioner made a tender in person and in writing of this sum to Joseph, requesting subrogation to Joseph's rights, giving Joseph a copy of his recorded deed of trust. He used for this tender $22,000 in cashier's checks in his name which had been furnished to him by Walker. The tender was refused and the checks were returned to Walker. Joseph and his attorney thought that the note and deed of trust were spurious. On January 25 petitioner made a tender to First Western Bank, the trustee, again using cashier's checks totaling $22,000 furnished by Walker, made payable to himself and to the trustee, and cash, some of which was his own. The trustee refused to transfer Joseph's rights to him but offered upon payment of the indebtedness to cancel the note and to reconvey the deed of trust to the grantor. Petitioner rejected this offer.

Petitioner was accompanied on that occasion by a client, Herman Josephson, whom he had solicited to invest $20,000 in the Joseph trust deed with an inducement of $2,000 or $3,000 bonus. Josephson, however, was interested only in an investment, not in litigation. He would not put up his own money until title was clear. From the evidence it could be inferred that Walker's attempted use of his own money, and of petitioner as a conduit, to purchase the second deed of trust was part of a scheme whereby someone on his behalf could bring foreclosure proceedings. Petitioner is consistent in his explanation that their agreement was that if he helped Walker, Walker would pay off the Brink's judgment and would also "take care of" petitioner.

On January 26, 1965, the day after the trustee refused the tender, petitioner filed an action in the superior court in his own name against Joseph seeking to restrain the trustee's sale, alleging that he held a bona fide junior deed of trust and an option to buy and that he would be irreparably damaged if the sale went through. The temporary restraining order then issued was later dissolved and the property was sold on February 24 to Joseph for the amount of the deficiency. Petitioner was present but did not bid. On May 24, 1965, he filed a second verified complaint seeking to have Joseph declared a constructive trustee of the land and of certain profits over $20,000 received by Joseph on a subsequent sale, again alleging unlawful refusal of his bona fide tender. The two actions were consolidated for trial in November 1966. Meanwhile a disciplinary investigation of petitioner had begun and on August 29, 1966, notice of an order to show cause was issued.

Petitioner was charged by the local administrative committee with com-

mingling of client's funds (count I); knowingly making false statements under oath in a civil action (II); and filing a verified complaint in that action knowing that it contained a false allegation (III). An amended notice charged that petitioner represented adverse interests for his own personal gain (IV) and that he took the $2,000 note and deed of trust as part of a dishonest scheme and plan to eliminate all subordinate liens in the Pacoima property (V). It was charged that such acts were in violation of his oath and duties as an attorney (Bus. & Prof. Code, § 6103), the commission of acts involving moral turpitude and dishonesty (Bus. & Prof. Code, § 6106), and violation of rules 4, 6, 7 and 9 of Rules of Professional Conduct.

Pleadings and depositions in the civil actions were in evidence in the disciplinary proceedings and are part of the record herein. In his verified complaint filed January 26, 1965, petitioner declared that he was a bona fide lien holder and that his tender of payment had been improperly rejected by the owner of the second deed of trust. On February 5, in a declaration under oath in support of his application for preliminary injunction he declared that he had never represented Economic Services and that his interests had been adverse to theirs from the beginning. In a deposition dated April 12 he testified that the consideration for the deed of trust was forbearance to take further legal action on an indebtedness owing to an undisclosed principal, for whom he was acting as attorney. When questioned as to whether the "real owner" of the note and deed of trust was the undisclosed principal he asserted the attorney-client privilege. When asked whether he was acting for himself or an undisclosed principal he answered in an evasive and illusory manner. The deposition was terminated after 12 pages and a motion was made to compel further answers. The motion was granted. On May 14 in a sworn declaration he stated that the client for whom he entered into negotiations with Economic Services did not authorize its name to be revealed.

In his second complaint filed May 24, seeking to enforce a constructive trust, he alleged that he had given good and valuable consideration to Economic Services for the note and deed of trust, that the company was insolvent, and that this was the only real property which would be applicable to the satisfaction of the indebtedness to him under his deed of trust. He claimed damages in the sum of $52,000. In a deposition dated August 23 after an order issued requiring him to answer further questions, he testified that he had performed legal services for Economic Services in 1964 and 1965 for which he was to be paid by them in connection with resolving their controversy with Brink's; that some of these services were going to be performed in the future, invoking the attorney-client privilege with

regard to further disclosure as to these services; that there was no firm agreement with Economic Services as to how they would pay him; that he could not answer questions as to what he was purportedly to do on behalf of Brink's, again invoking the privilege on their behalf; and that he had represented Economic Services in several matters, including the Brink's deal, at the time the note and deed of trust were executed on January 22, and asserted the privilege on behalf of Economic Services as to further disclosure of these matters. When questioned about his February 5 declaration that he did not represent Economic Services, he replied that the question had been asked and answered, and refused to answer further, asserting the privilege.

When asked whose money he used with regard to his tender of $22,600 he replied that it was his and that he made the tender on his own behalf. He also asserted that he was the real owner of the note and deed of trust as of April 12, [at which time he had stated he took them as agent for an undisclosed principal]. He indicated that if the $2,000 was paid to Brink's this would not reduce the principal of the promissory note which was the subject of the lawsuit. [At the disciplinary hearing he claimed that the note was still valid and outstanding and that Economic Services owed him the $2,000.]

In a declaration under oath on September 22, made in opposition to a motion to compel further answers to questions asked at the second deposition, he stated that he did not represent Economic Services, and that he would not answer questions regarding his representation of Walker because this would reveal information adverse to the interest of his client,—Walker. In a deposition taken November 3 he indicated that he represented Walker but not Economic Services; when asked about the $2,000 note he indicated that he thought it had to do with the Brink's judgment but he was not certain of it. He gave evasive answers regarding the ownership of the $22,000 cashier's check tendered to the trustee. He said that it was not his, that he did not know whose money it was. As to the cash tendered by him on that date he admitted that part of it was Walker's. He did not reveal how much of it belonged to Walker. He admitted that he did not return any of it to Walker.

The two civil actions were consolidated for trial. Judgment was for defendant Joseph. It was affirmed on appeal (*Lee* v. *Joseph,* 267 Cal.App.2d 30 [72 Cal.Rptr. 471]; no petition for hearing was filed in this court).[1] The

[1]The trial court held that petitioner was acting as attorney for Economic Services, Inc., the trustor; that there was no consideration given by him for the note; that the money tendered to Joseph was actually Walker's money. The Court of Appeal held that petitioner had only a sham obligation and had no right of redemption as a junior lienor; that the purported lien, if but one in behalf of the owner, was no

decision was filed on October 30, 1968, subsequent to the hearing before the disciplinary board but two weeks prior to the filing of its findings and decision.[2] The record herein is voluminous.

There were some differences in the findings made by the local committee and by the disciplinary board, although each found him culpable and recommended stringent discipline. The local committee found that there was no commingling. The board eliminated this finding. The local committee found that there was good and valuable consideration for the promissory note,—alternatively, either for legal services rendered by petitioner to Economic Services, or for forbearance by him in the enforcement of the Brink's judgment against Economic Services. However it found that in making the tender to Joseph and to the trustee, with Walker's money, that petitioner acted for and on behalf of Walker to cut off and make valueless the third and fourth encumbrances, to the advantage and for the benefit of Walker and Economic Services. The disciplinary board eliminated the finding that consideration had been given by him for the note and deed of trust, and found that he had solicited them and had made a tender to Joseph, for the fraudulent purpose above stated, and that they had no real effect and were but a sham.

Each found that petitioner knew of assets belonging to Economic Services and that he did not attempt to enforce the judgment held by his client Brink's against them; also that the services rendered by him to, for, and on behalf of Walker, whether of a business or legal nature, were in conflict with the best interests of petitioner's client Brink's. Each found that he did not notify Brink's that he held the note and deed of trust on their behalf, the board modifying it by adding "until after Brink's, Inc. was apprised of" petitioner's assertion in *Lee* v. *Joseph* that he was acting for an undisclosed principal therein (referring to attorney Rubin's letter to Brink's). Each found that at all material times petitioner knew that Walker was the president of Economic Services and was the primary, if not the sole stockholder thereof, and that prior to January 22, 1965, petitioner knew that Walker used funds from companies or business enterprises owned or controlled by him to partially pay the indebtedness of Economic Services.

The local committee found in the alternative as to the falsity of four

lien at all because the owner of a piece of property cannot have a lien upon it; that the scheme was one intended to squeeze out intermediate junior lienholders; and that there was no effective tender. A footnote refers to testimony by petitioner that he did not have even an equitable interest in the tendered monies. (267 Cal.App.2d at p. 35.)

[2] The local administrative committee held seven hearings and filed its findings on July 1968. Additional oral and documentary evidence were heard by the disciplinary board, and its findings and recommendations were filed on November 15, 1968.

sworn statements, namely that either one or the other was false but did not decide which was false. The disciplinary board found categorically that each statement was false and was known by petitioner to be false when made,—specifically referring to his sworn statements of February 5, April 12, May 14 and August 23, 1965, hereinabove discussed. The local committee recommended a two-year suspension. The disciplinary board recommended suspension for three years with actual suspension for one year.

■ In reviewing disciplinary proceedings conducted by the State Bar this court exercises an independent judgment on the evidence and passes upon its weight and sufficiency. ■ The burden is upon petitioner, however, to demonstrate that the findings are not supported by the evidence or that the recommendations are erroneous or unlawful. In meeting this burden he must demonstrate that the charges are not sustained by convincing proof and to a reasonable certainty. (*Reznik* v. *State Bar* (1969) 1 Cal.3d 198, 202 [81 Cal.Rptr. 769, 460 P.2d 969].) ■ We resolve all reasonable doubts in favor of the accused and if equally favorable inferences may be drawn from a proved fact, the inference which leads to a conclusion of innocence rather than one leading to a conclusion of guilt will be accepted. (*Most* v. *State Bar* (1967) 67 Cal.2d 589, 596 [63 Cal. Rptr. 265, 432 P.2d 953].)

■ *Questions:* One. *Is the evidence sufficient to support the findings?*

*Yes.* Judged by the above standards petitioner has not sustained his burden of proof herein. The evidence against him, as well as the inconsistency and falsity of his own explanations, demonstrate his bad faith and dishonesty and his violation of his oath and duties as an attorney.

There is no merit to his contention that the questions propounded to him were imprecise and ambiguous and that this caused the inconsistencies in his answers. His assertion that he believed each statement to be true when he made it is a subjective matter. There was sufficient objective evidence to support an inference that he could not have had such a belief and that he knowingly made false statements.

Review of the portions of the transcript which petitioner claims were wrongfully stricken does not aid him. They do not show that the dealings between himself and Brink's were fair and reasonable or that they were fully understood by Brink's. ■ The relationship between an attorney and client is a fiduciary relationship of the very highest character. ■ All dealings between an attorney and his client that are beneficial to the attorney will be closely scrutinized with the utmost strictness for any unfairness.

(*Clancy* v. *State Bar* (1969) 71 Cal.2d 140, 147 [77 Cal.Rptr. 657, 454 P.2d 329].)

It is significant that petitioner failed to convince either the local administrative committee or the court in the civil action of his credibility. ■ It is proper to give great weight to the action of the local administrative committee, that body being in a better position than this reviewing court to pass upon truthfulness. (*Corn* v. *State Bar* (1968) 68 Cal.2d 461, 466-467 [67 Cal.Rptr. 401, 439 P.2d 313].) ■ Some of his testimony was inherently improbable as the trial court noted in *Lee* v. *Joseph, supra,* 267 Cal.App.2d at page 33, footnote 3, (i.e., that he was given $2,000 to secure a slight delay for the benefit of a judgment debtor in the collection of a $2,080 judgment in which he was representing the judgment creditor).

Further comment upon the evidence going to consideration for the note and mortgage, the unlawfulness of the scheme in which he participated, and his representation of adverse interests appears unnecessary in view of the overwhelming weight of the evidence against him. The board properly rejected the finding that there was good and valuable consideration. No benefit was conferred upon Brink's by his agreement to forbear nor by his performance of services for Walker and/or Economic Services. This transaction was properly viewed by the board as part of the unlawful dishonest scheme for the benefit of Walker and/or Economic Services. It also appears to have been for the benefit and advantage of petitioner. It was a clear violation of his fiduciary duty to his client, Brink's.

Petitioner urges that this court may not judicially notice the decision in *Lee* v. *Joseph, supra,* and that it is limited in its review to those portions of the record which were before the local administrative committee. ■ The parties to the civil action, Lee and Joseph, were the accused attorney and the complainant in the investigatory matter. Directly in issue in both proceedings were petitioner's status as a bona fide lienholder and the validity of the consideration given by him for his note and deed of trust. Pleadings and depositions in the civil action were properly part of the evidence which was considered in the disciplinary hearings, not only as evidence of false allegations filed in a civil action but as bearing upon the precise issues recited in the notice to show cause in the disciplinary hearing. Under proper circumstances the transcript in a civil proceeding may be considered in a disciplinary action. (*Eschwig* v. *State Bar* (1969) 1 Cal.3d 8, 18 [81 Cal.Rptr. 352, 459 P.2d 904].) It does not appear that the transcript was so used. The record in the civil proceeding is not before us. It is noted that numerous witnesses appeared at the disciplinary hear-

ings, some of whom were essential to the issues in the civil proceedings and doubtless appeared therein.

The issue in *Lee* v. *Joseph* was not decided on appeal until after the committee and the disciplinary board had separately and independently found petitioner culpable in the deed of trust transaction and had recommended suspension from practice. These recommendations were based solely upon the basis of evidence which was properly before the committee and the board. Solely upon that basis it is upheld by this court. ■ The decision in the civil action is, however, part of the relevant facts and circumstances which bear upon the charges against petitioner of which this court may take judicial notice. We exercise our own judgment on the facts involved. (*Yapp* v. *State Bar* (1965) 62 Cal.2d 809, 817 [44 Cal.Rptr. 593, 402 P.2d 361; cf. *Magee* v. *State Bar* (1962) 58 Cal.2d 423, 429 [24 Cal.Rptr. 839, 374 P.2d 807]; *Zitny* v. *State Bar* (1966) 64 Cal.2d 787, 790-791, fn. 1 [51 Cal.Rptr. 825, 415 P.2d 521].) That decision is a conclusive legal determination that petitioner gave no consideration for the note, insofar as any action based thereon by him against the maker is concerned.

■ Two. *Is the degree of discipline recommended appropriate?*

■ *Yes.* It makes no difference whether an attorney acts in a representative capacity for someone else or for himself if he commits acts involving moral turpitude, dishonesty or corruption. Moral turpitude includes fraud and intentional dishonesty for purposes of personal gain. (*In re Hallinan* (1954) 43 Cal.2d 243, 247-248 [272 P.2d 768].) ■ Knowingly making false statements, knowing that they were false when made, representation of adverse interests without a timely and complete disclosure and consent based upon full knowledge and understanding, participating in a fraudulent and dishonest scheme to cut off and make valueless the liens of junior encumbrances, filing a claim in a judicial proceeding based on a sham note and deed of trust, and making false allegations in sworn testimony therein are all serious breaches of the oath of office and the professional integrity of an attorney at law. They constitute violations of sections 6106, 6067 and 6068 of the Business and Professions Code. ■ Acts of fraud and deceit involve reprehensible conduct for an attorney and moral turpitude. (*Reznik* v. *State Bar* (1969) *supra,* 1 Cal.3d 198, 203-204; *Eschwig* v. *State Bar, supra,* 1 Cal.3d 8, 17-18; *Cutler* v. *State Bar* (1969) 71 Cal.2d 241, 252 [78 Cal.Rptr. 172, 455 P.2d 108].)

■ Violations of the Rules of Professional Conduct are also clearly shown by the evidence. A member of the State Bar shall not acquire an

interest adverse to a client (rule 4), and he may not represent conflicting interests except with the consent of all parties concerned, given after full knowledge of all the facts and circumstances. (Rule 7; *Anderson* v. *Eaton* (1930) 211 Cal. 113, 114 [293 P. 788]; *Ishmael* v. *Millington* (1966) 241 Cal.App.2d 520, 526-527 [50 Cal.Rptr. 592].) Petitioner's repeated false statements and attempts to deceive the court further support the conclusion that his violations of these rules were not mere technical violations but that they involved corrupt and dishonest purposes, which these rules were designed to prevent.

It is therefore ordered that Dale Einhorn Lee be suspended from the practice of law in the State of California for three years; that execution of our order be stayed and that he be placed on probation for said three years upon condition that he be actually suspended for the first year, and that he comply with the conditions of probation prescribed in the transcript of proceedings filed herein by the Disciplinary Board of the State Bar of California. The probation period shall commence 90 days after the filing of this order.

On August 26, 1970, the opinion was modified to read as printed above.