[L. A. No. 25274. In Bank. May 8, 1959.]

GEORGE B. T. STURR, Petitioner, v. STATE BAR OF
CALIFORNIA, Respondent.

George B. T. Sturr, in pro. per., and George O. West for Petitioner.

Garrett H. Elmore and Francis M. Wheat for Respondent.

THE COURT.—This is a proceeding to review the recommendation of the Board of Governors of The State Bar of California that petitioner be suspended from the practice of law for a period of five years. The Board of Governors found that petitioner (1) violated his oath and duties as an attorney and counselor at law, (2) committed acts involving moral turpitude and dishonesty within the meaning of section 6106 of the Business and Professions Code,[1] and (3) violated rules

---

[1]Section 6106 of the Business and Professions Code reads, in part: "The commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relations as an attorney or otherwise, and whether the act is a felony or misdemeanor or not, constitutes a cause for disbarment or suspension."

9 and 12 of the Rules of Professional Conduct of The State Bar.[2]

*Questions*: First. *Did petitioner violate (1) his oath and duties as an attorney and counselor at law, (2) section 6106 of the Business and Professions Code, and (3) rules 9 and 12 of the Rules of Professional Conduct of The State Bar?*

*Yes.* These rules are here applicable:

 1. In a disciplinary proceeding against an attorney, findings of fact by local administrative committees and the Board of Bar Governors are not binding on the Supreme Court, which will weigh and pass upon the sufficiency of the evidence to sustain the findings of the board.

 2. The burden is upon the petitioner seeking a review of the Board of Bar Governors' recommendation to show that its findings are not supported by the evidence or that its recommendation is erroneous or unlawful. (*Tonini* v. *State Bar,* 46 Cal.2d 491, 492 [1], [2] [297 P.2d 1]; *Clark* v. *State Bar,* 39 Cal.2d 161, 165 [1], [2] [246 P.2d 1].)

 Applying the foregoing rules, the record in the instant proceeding discloses that petitioner was admitted to the practice of law in California on June 12, 1951, and is and at all times herein mentioned was a member of The State Bar.

In August 1953 petitioner was employed by Merle Persinger and L. O. Persinger, copartners engaged in the manufacture and sale of barbecue equipment, for the purpose of incorporating the business of the partnership. Pursuant thereto he

---

[2]Rule 9 of the Rules of Professional Conduct is: ''A member of the State Bar shall not commingle the money or other property of a client with his own; and he shall promptly report to the client the receipt by him of all money and other property belonging to such client. Unless the client otherwise directs in writing, he shall promptly deposit his client's funds in a bank or trust company, authorized to do business in the State of California, in a bank account separate from his own account and clearly designated as 'Clients' Funds Account' or 'Trust Funds Account' or words of similar import. Unless the client otherwise directs in writing, securities of a client in bearer form shall be kept by the attorney in a safe deposit box at a bank or trust company authorized to do business in the State of California, which safe deposit box shall be clearly designated as 'Clients' Account' or 'Trust Account' or words of similar import, and be separate from the attorney's own safe deposit box.'' (47 Cal.2d 10.)

Rule 12 of the Rules of Professional Conduct is: ''A member of the State Bar shall not communicate with a party represented by counsel upon a subject of controversy, in the absence and without the consent of such counsel. This rule shall not apply to communications with a public officer, board, committee or body.'' (33 Cal.2d 30.)

recommended and undertook the incorporation of three corporations, Big Boy Manufacturing Company, Big Boy Barbecue Sales Company, and Big Boy Barbecue Export Company. He was placed on a retainer basis by the Big Boy Manufacturing Company from December 1953 until May 1955 at the rate of $250 per month.

He advised the Persingers that it would be necessary to have the real property and personal assets of the partnership appraised in order to incorporate the partnership and issue stock. On April 16, 1954, he engaged J. A. Mann and Ralph S. Bowdle to make an appraisal and informed his clients that the cost would be $300. The clients paid him this amount, which he placed in his personal bank account. Thereafter he informed his clients that the total cost for the appraisal would be $1,200, and they gave him an additional $300 toward payment thereof. At that time he stated to them that he would see that the remainder of the fee to Mann and Bowdle for their appraisal was paid. He then appropriated to his own use the $600 given to him by his clients for the appraisal fee. Later he paid $500 from his personal funds to Mr. Mann, using his personal check, which upon presentation was dishonored. Shortly thereafter it was again presented for payment by Mr. Mann and was honored. Without the knowledge or consent of his clients, petitioner retained for his personal use and benefit the remaining $100 given him for the specific purpose of paying the appraisal fee. Later, Big Boy Manufacturing Company was presented with bills for the services of the appraisers, totalling $1,150, and paid them an additional $650 on October 25, 1955.

On March 15, 1954, an action was instituted in the United States District Court by Robert C. Wian against Big Boy Manufacturing Company, in which the plaintiff sought to prevent petitioner's clients from using the words ''Big Boy'' in the conduct of their business. Petitioner stated to his clients that he was unfamiliar with this type of action and recommended the employment of Albert Lee Stephens, Jr., another attorney, to handle the defense of the action. Petitioner and Mr. Stephens agreed upon a proposed retainer fee of $5,000 to be paid by Big Boy Manufacturing Company, to be divided between them, one third to petitioner and two thirds to Mr. Stephens.

Petitioner informed his clients that the $5,000 would cover all costs and legal fees for handling the case through a

decision by the trial court and that he would see that Mr. Stephens was paid his fee out of the $5,000. Subsequently they paid petitioner the following:

| | |
|---|---|
| March 19, 1954 | $2,000 |
| March 30, 1954 | 250 |
| April 26, 1954 | 1,000 |
| July 12, 1954 | 1,565 |
| August 25, 1954 | 500 |
| Total | $5,315 |

The foregoing payments were made to petitioner for attorneys' fees in connection with the Wian case, except the $500 paid on August 25, 1954, which amount represented a deposit by the clients for additional costs for depositions and patent office searches requested by petitioner. He commingled in his personal bank account with his own funds $3,750 of the $5,315 paid to him by his clients, and he cashed the remaining check for $1,565. He converted and appropriated all the $5,315 to his own use and benefit without the knowledge or consent of his clients. No depositions were ever taken in the case, nor were patent office searches made while he was employed in connection with this matter. He did not disclose to Mr. Stephens that he had received the $5,315.

On August 9, 1954, petitioner paid $250 to Mr. Stephens, and on February 21, 1955, he paid him an additional $1,000.

On February 16, 1955, petitioner and Mr. Stephens agreed upon a total fee of $4,000 to be charged Big Boy Manufacturing Company for their services in handling the case through a decision in the trial court, of which amount Mr. Stephens was to receive $3,000 and petitioner $1,000. He failed to pay Mr. Stephens any portion of the $3,000 except the sum of $1,250 heretofore mentioned. He did not disclose to his clients that the total fee chargeable to them for services in handling the case through a decision in the trial court had been limited to $4,000.

After a decision in the trial court, it became evident that the plaintiff intended to appeal from the judgment, and petitioner advised his clients to contest the appeal. He and Mr. Stephens agreed upon a fee of $2,500 to be charged for services rendered on appeal, to be divided $2,000 to Mr. Stephens and $500 to petitioner. He represented to his clients that the $2,500 would cover all fees and expenses relative to the appeal.

On February 18, 1955, the clients paid petitioner $2,500 for

the appeal fee and expenses. He deposited this sum in his personal bank account and commingled it with his own funds, all without the consent or knowledge of his clients. He did not disclose to Mr. Stephens that he had received the $2,500; neither did he pay any portion of it to him. On May 19, 1955, the clients were required to pay to Mr. Stephens, at his request, the sum of $1,750, being the unpaid balance of the agreed fee of $3,000 above described for handling the case through the decision in the trial court. Thereafter, at Mr. Stephens' request, the clients paid him an additional $2,000 for representing them on the appeal.

On November 6, 1953, the clients paid petitioner, at his request, $300 to be used by him for payment of fees for filing the articles of incorporation and for filing an application for a permit to issue stock of Big Boy Manufacturing Company. He deposited this sum in his personal bank account, commingled it with his own funds, and appropriated it to his own use without the knowledge or consent of his clients.

In June 1954 petitioner paid $183 from his own funds as a filing fee, franchise tax, and other related expenses.

On May 24, 1955, petitioner filed with the Commissioner of Corporations of the State of California applications for permits to issue shares of capital stock of the three corporations mentioned and paid the commissioner $187.50 for filing fees.

On August 16, 1954, at petitioner's request, his clients paid him $855, to be used as follows:

$100 fees for filing amended articles of incorporation
350 payment of franchise tax
5 certifying amended articles of incorporation
50 filing amended articles in the County of Los Angeles
350 fee for filing application for permit to issue additional authorized stock

On August 17, 1954, he converted the $855 to his own use without the knowledge or consent of his clients. On August 20, 1954, he paid the actual fee for filing the amended articles of incorporation of Big Boy Manufacturing Company in the amount of $22.50.

On August 15, 1954, petitioner recommended to his clients the formation of two separate corporations to manufacture barbecue equipment for Sears, Roebuck & Co. On September 1, 1954, his clients paid him, at his request, $855, to be used as follows:

$100 filing fee of corporate charters
350 payment of franchise tax
5 certification of articles of incorporation
50 filing fee, County of Los Angeles
350 fee for filing application for permit to issue stock

He deposited this sum in his personal bank account, commingled it with his own funds, and appropriated it to his own use and benefit without the knowledge or consent of his clients. At no time did he incur or pay any costs or expenses in connection with the formation of the two corporations last mentioned.

On August 25, 1954, petitioner received $340 from Big Boy Manufacturing Company in payment of a statement for costs in obtaining two trade-marks for his client. He deposited this money in his personal bank account and converted it to his own use and benefit without the knowledge or consent of his client. He did not at any time incur any costs on behalf of his client for the purpose of obtaining trade-marks.

On September 27, 1954, petitioner received $355 from Big Boy Manufacturing Company for the purpose of paying filing fees and other related costs in connection with obtaining United States Letters Patent on a brazier flip grille and fees to patent attorneys engaged by him with his client's consent. He deposited this sum in his personal bank account, commingled it with his own funds, and converted it to his own use and benefit without the knowledge or consent of his client.

On or about August 17, 1955, petitioner paid $75 from his own funds to the patent attorneys to cover the cost of a patent search made by them at his request in October 1954. On January 7, 1957, he paid the attorneys $280 from his personal funds for services and filing fees incurred by them at his request with reference to the filing and processing of an application for United States Letters Patent on the brazier flip grille.

Petitioner admits that at various times his clients paid him sums of money to be used for specific purposes, which sums he did not deposit in a trust account, but instead deposited in his personal bank account. Petitioner maintained a trust account during this period of time.

In the early part of 1955 petitioner was engaged by John W. Houser to represent him in a divorce action brought by his wife, Doris L. Houser, in the Superior Court of Los Angeles County. He appeared with his client at a hearing for an order to show cause with reference to attorney's fees

and costs in connection with the divorce action. It was agreed between the parties and through their attorneys that the residence property owned by the plaintiff and the defendant should be sold. Thereafter the property was sold, with the Johnston Escrow Company handling the sale, which resulted in an equity of $1,028.83 payable to the Housers. A check for this amount was issued by the escrow company on April 18, 1955, payable to John W. Houser and Doris L. Houser. This check was delivered to petitioner in April 1955 by his client, John W. Houser, with instructions to hold the same until the plaintiff should endorse it and thereafter to use the proceeds to pay federal and state income taxes due and payable for the year 1954 and certain other outstanding bills of the Housers.

Throughout all the proceedings in this matter, Doris L. Houser was represented by Donovan Ballenger, an attorney at law. Without the knowledge or consent of his client, Doris L. Houser or her attorney, petitioner on May 19, 1955, used the check to open a new personal bank account in his name and deposited it in said account. The endorsements of John W. Houser and Doris L. Houser on the reverse of the check were not made by them, or either of them. Petitioner converted the proceeds of this check to his own use and benefit without the knowledge or consent of his client or the plaintiff, Doris L. Houser.

On May 24, 1955, the interlocutory decree of divorce granted to Doris L. Houser in the above-mentioned action was entered in the register, which decree provided that after the plaintiff and the defendant had endorsed the check for $1,028.83, the proceeds were to be delivered to the plaintiff's attorney for payment of federal and state income taxes, with the remainder payable to the plaintiff. Petitioner had knowledge of this decree and its contents, but he did not advise Mr. Ballenger what had been done with the proceeds of the check.

On March 16, 1955, Mr. Houser delivered to petitioner $450 in cash, to be paid as follows: $160 to Doris L. Houser, representing payments ordered for her support pursuant to the interlocutory decree of divorce, and the remainder of $290 to Mr. Ballenger, her attorney, for his fees and court costs. Petitioner converted and appropriated the $450 to his own use without the knowledge or consent of his client, and he did not at any time make any payment to Mr. Ballenger.

In April and May 1955 while Doris L. Houser was represented by Mr. Ballenger, which fact was known to petitioner, he, without the consent of Mr. Ballenger, communicated with

the plaintiff in person concerning matters involving the settlement of property and other matters related to the pending divorce action.

On May 25, 1955, petitioner prepared a document entitled Affidavit and Petition in Support of Motion to Set Aside Interlocutory Judgment in the Houser matter, which purported affidavit contained numerous false statements, known by petitioner to be false, to wit: that the defendant, John W. Houser, and his counsel were approached by the plaintiff and informed by her that she was no longer represented by Mr. Ballenger; that the plaintiff endorsed the check from Johnston Escrow Company in the sum of $1,028.83; that John W. Houser requested petitioner to cash the check for Mr. Houser's benefit; and that petitioner delivered to Mr. Houser $1,028 in cash. Thereafter petitioner caused the three-page affidavit to be attached to a fourth page containing the signature of John W. Houser and a jurat dated May 25, 1955, signed by petitioner as notary public. At the time Mr. Houser signed the fourth page, petitioner did not display to him the three pages containing the above-mentioned false statements.

It is apparent that the foregoing evidence supports the fact that petitioner violated (1) his oath and duties as an attorney and counselor at law, (2) section 6106 of the Business and Professions Code, and (3) rules 9 and 12 of the Rules of Professional Conduct of The State Bar.

■ Second. *Was petitioner given the benefit of a presumption of innocence in the proceeding?*

*Yes.* Those charged by law in the first instance with the duty of passing upon the truth of the accusations against petitioner resolved the conflicts in the evidence against him. Therefore, on this review the burden is upon petitioner to show wherein the decision of the Board of Governors was erroneous or unlawful. (*Ring* v. *State Bar*, 218 Cal. 747, 750 [2] [24 P.2d 821]; *Aydelotte* v. *State Bar*, 209 Cal. 737, 740 [2] [290 P. 41].) This burden he has not met.

■ Third. *Was there undue delay in the proceedings before the local administrative committee of The State Bar?*

*No.* The record shows that petitioner, both personally and by his counsel, waived time to answer and that the second amended notice to show cause was filed with the consent of petitioner's counsel. The record further discloses that part of the delay was attributable to the death of petitioner's original counsel. By reason of the nature of the defense and the

legitimate opportunity to cross-examine State Bar witnesses and to offer witnesses on petitioner's behalf, the proceeding became a protracted one. However, it does not appear that petitioner was in any way prejudiced by the length of time taken in disposing of the matter. (*Cf. Paonessa* v. *State Bar,* 43 Cal.2d 222, 226 [272 P.2d 510].)

█ Fourth: *What punishment should be imposed?*

The rules of The State Bar that petitioner violated were designed to prohibit unprofessional conduct. In the present proceeding the record discloses a callous and brazen indifference to the obligations of an attorney and a course of conduct of deliberate commingling and appropriation of clients' funds to petitioner's own use.

Misappropriation of funds entrusted to an attorney at law is a gross violation of general morality as well as professional ethics and, in addition, is likely to endanger the confidence of the public in the legal profession. It deserves severe punishment. In *Mills* v. *State Bar,* 6 Cal.2d 565 [58 P.2d 1273], a case involving the misappropriation of clients' funds, this court said at page 567 [3] : ''Whatever might be said in favor of a milder punishment for single misdemeanors not involving deliberate moral turpitude, there is no doubt in our minds that any lawyer who is guilty of habitual misuse of the funds of his clients should be deprived of the license under which he is authorized to practice law, and by which he has been recommended to the public as a person worthy of trust.'' (See also *Narlian* v. *State Bar,* 21 Cal.2d 876, 887 [5] [136 P.2d 553].)

Under these circumstances petitioner should be removed from the practice of law.

It is therefore ordered that George B. T. Sturr be disbarred and that his name be stricken from the roll of attorneys of this state, the order to become effective 30 days after the filing of this opinion.

Petitioner's application for a rehearing was denied June 3, 1959.