[S. F. No. 20382. In Bank. Oct. 31, 1960.]

CHARLES DREYFUS, Petitioner, v. THE STATE BAR
OF CALIFORNIA, Respondent.

Gordon Johnson for Petitioner.

Garrett H. Elmore for Respondent.

THE COURT.—Petitioner seeks review of a disciplinary proceeding in which the Board of Governors of The State Bar found that he "intentionally misappropriated and expended for his own purposes the sum of $10,594.81 [*sic*]"[1] entrusted to him by clients. The board recommended disbarment by a vote of ten to four, with three of the minority stating that they believed the discipline too severe. In arriving at its recommendation the board expressly considered a previous one-year suspension, imposed in 1952, for commingling funds of a client and withholding them to coerce payment of a fee. Petitioner urges that the evidence does not support the finding of intentional misappropriation and, in the alternative, that the penalty is too severe.

We have passed upon the weight as well as the sufficiency of the evidence, as we have the power and duty to do in this proceeding (*Webb* v. *State Bar* (1957), 47 Cal.2d 866, 868 [1] [306 P.2d 458]; *Browne* v. *State Bar* (1955), 45 Cal. 2d 165, 168 [2] [287 P.2d 745]), and have concluded that intentional misappropriation is established and that The State Bar's recommendation as to discipline is proper in view of the hereinafter related circumstances.

Early in 1957, complaining witness Homer T. Craig and Mrs. Craig employed petitioner as attorney. Craig and a company of which he was president were "management consultants" for various corporations. Craig feared personal liability because of his connections with some of these corporations which were in financial difficulties. Petitioner represented the Craigs in regard to these corporations and various other business and legal matters until October, 1957, when the attorney-client relationship was terminated because of the dispute which gave rise to the instant proceeding. Craig's legal problems were numerous and petitioner's services as such were adequate and satisfactory. The local committee found that their reasonable value was $8,000.

The disputed $10,595.41 is part of $17,888.75, the amount of a cashier's check which petitioner deposited in his trustee account on April 29, 1957. This check, made payable to Mr. and Mrs. Craig, was endorsed by them:

---

[1]The sum which is in dispute and which, according to the complaining witness, was misappropriated, is $10,595.41.

"Pay to the order of Charles Dreyfus

"Trustee Account."

Dreyfus endorsed the check:

"Pay to the order of Pacific National Bank

"Charles Dreyfus

"Trustee."

The check represented the net amount which the Craigs had obtained by mortgaging their home. According to Craig's testimony, the $17,888.75 was to be held for the Craigs in petitioner's trustee account so that it could not be reached by creditors in litigation connected with the corporations with which Craig was involved.[2] According to petitioner, however, he informed Craig, before the Craigs mortgaged their home, that petitioner wanted a $10,000 retainer and an advance of $1,000 on account of costs, and petitioner thereafter told Craig that the check should be endorsed "to Charles Dreyfus, Trustee, as the difference between retainer and advance on costs is yours"; the check was endorsed to Dreyfus as trustee, despite the agreement with Craig that it included $10,000 on account of retainer and $1,000 on account of costs," because "Mr. Craig did not want his wife to know he was paying anything on account of fees"; the $6,888.75 which, on petitioner's view, he was holding for the Craigs was deposited in petitioner's trustee account "because of the numerous creditors who he [Craig] feared would attach his home or his account, etc." To the question, "When those proceeds went into your trustee account under this arrangement, as you have alleged, did you at that time remove ten thousand plus costs?" petitioner testified, "No, I did not. I did it over a period of time." Asked, "Was there any particular reason to do it over a period of time?" petitioner explained that it was

---

[2] Craig testified, "We were confronted with a personal problem with some work being done by HCC Corporation [sic; the reference is to HEC Corporation, of which Craig had been a stockholder and officer and for which he acted as "management consultant"; HEC filed a petition in involuntary bankruptcy on April 15, 1957] for which my company, Homer T. Craig and Staff, Incorporated, was doing some work and there was some personal involvement and upon advice of counsel, we were directed to clear our assets so that they would not be easily attachable. There was also to be a subsequent problem of liquidating certain indebtedness in several directions and so upon advice of counsel we mortgaged our home, and this check [for $17,888.75] represents the proceeds. . . ." "Mr. Dreyfus indicated that we would have the right to place it in his trustee account if we . . . wished to do so; and we made that decision that we would place this check in his trustee account."

"because of personal obligations that I [petitioner] had. And I wanted to leave it there rather than transfer it into a personal account where it might be liened."[3]

Craig testified that he had no understanding or discussion with petitioner as to an advance on account of fees and costs; that his only discussion concerning fees was about June 1957, when he mentioned to petitioner that he had not received a bill and petitioner replied, "Don't worry about that."

On May 13, 1957, at Craig's direction, petitioner paid $3,293.34 from the trustee account to the Bank of America, a creditor of Craig. Assuming that the entire $17,888.75 had been deposited in trust for the Craigs, petitioner held $14,595.41 ($17,888.75 less $3,293.34) in trust for them after the May 13th withdrawal. The balance in the trust account was then nearly $23,000, but by June 19, 1957, it had been reduced to $12,032.08 and thereafter it decreased. On August 7, 1957, at Craig's request petitioner paid him $1,000 from the trustee account and this was followed by $3,000 on September 8, 1957. The latter withdrawal left a balance of only $229.08 in the trustee account.

Craig testified and petitioner denied that on August 30, 1957, Craig demanded that petitioner pay the "balance" (which, accepting Craig's view of the transactions, would then have been $13,595.41), and that after the September 8th payment he and petitioner had a number of conversations concerning Craig's request for repayment of the then "balance" of $10,595.41.

On October 14, 1957, Craig, his business associate Bishop, and petitioner met. Craig presented and asked petitioner to sign a paper which referred to petitioner's receipt of the $17,888.75 and his payments to Craig totaling $7,293.34 and stated that petitioner "owed him [Craig] the difference." Petitioner testified that he said to Craig, "No, I don't want to sign that, but I will rephrase it." Petitioner at once prepared in his handwriting, signed, and delivered to Craig a document reading as follows:

On "April 27, 1957, Homer T. Craig and Nancy S. Craig

---

[3]This testimony, together with evidence that before and during petitioner's employment by Craig repeated "round figure" withdrawals from the trustee account corresponded in amounts (e.g., $200, $250, $300) with deposits of the same dates in petitioner's personal account, might suggest that petitioner was commingling his and his client's funds, rather than misappropriating the funds of the client. However, the local committee of The State Bar determined that petitioner was not guilty of violating rule 9 of the Rules of Professional Conduct (commingling property).

delivered me a check in the sum of Seventeen Thousand Eight Hundred Eighty Eight and 75/100ths Dollars ($17,888.75) which was deposited in the Charles Dreyfus, Trustee Account.

"With their knowledge and consent from said funds $3293.94 was paid to Bank of America on May 9, 1957 and $4000.00 was paid to Homer Craig August 2, 1957 and September 5, 1957, leaving a credit balance due them of $10,594.81 [*sic*]."

Petitioner testified that before the just-described meeting Craig had telephoned to him and said that he was being harassed by his wife, his brother-in-law, and Bishop; that Craig could not admit to them that he had paid petitioner any fees; and that Craig asked petitioner to "go along" and "back me up with Mr. Bishop." Petitioner further testified that he phrased the document of October 14, 1957, "on the basis of leaving a contract balance due of $10,594.81 [*sic*], because this was a contract balance on account of attorney's fees and court costs which Mr. Craig and I both understood, and that is the way [*sic*] it was worded in that manner." Petitioner did not bill Craig for services or costs; it is petitioner's position that it was understood between him and Craig that a bill would not be presented until the services were completed.

Later in October, 1957, according to petitioner's testimony, Craig "threatened to take me to the Bar Association; and having had an instance before with The State Bar, rather than do that I agreed that I would repay him the $10,000. And then there was a discussion about my giving my life insurance, my $10,000 life insurance, as security for it. I indicated that I would do that.

"Then subsequently, there was a discussion with Craig, and he wanted the $10,000 right now or else. So at that point I refused to assign the life insurance policy" and told Craig, "if that is your case, you just go shoot your best shot."

At the end of October, 1957, another attorney took over Craig's affairs. This proceeding was subsequently instituted. Also Craig sued petitioner for the $10,595.41 and petitioner cross-complained for $15,000, the alleged reasonable value of his legal services.

Petitioner urges that the above recounted circumstances of October 14, 1957, which are not contradicted by Craig, "support petitioner's version of the transaction as one in which the Craigs had a credit balance for services and costs, since as of the date of the statement petitioner had not yet billed

Craig for services and disbursements." In his brief he offers the following explanation of the meaning of the document which he executed on October 14:

"Any law office . . . receiving an advance on fees and expenses sets up on its books a credit entry covering the advance. At the conclusion of the transaction, when a bill for services and disbursements is transmitted, it sets up an offsetting debit item. But in the interim, it continues to carry *the credit balance.* Petitioner's execution of the document delivered to Craig is entirely consistent with and fully supported by normal business conduct.

"Bearing in mind that Craig had presented a document showing an indebtedness and that petitioner declined to sign that document but instead wrote out a document referring to a credit balance, this evidence compels two important conclusions:

"1. That there was an arrangement between petitioner and Craigs with respect to an advance of fees and costs; and

"2. That the document signed by petitioner was not an acknowledgment of a cash indebtedness but only a recognition of a credit balance for fees and costs."

■ The record as a whole, and particularly the following circumstances, lead us to reject petitioner's attempted explanation and to agree with the conclusion of the Board of Governors (which was also the conclusion twice reached by the local administrative committee after hearings in this matter) that petitioner's conduct in regard to the $10,595.41 was in violation of his oath and duties as an attorney (Bus. & Prof. Code, § 6103) and constituted acts involving moral turpitude (Bus. & Prof. Code, § 6106):

Assuming that Craig did not wish his wife and associates to know that he had advanced petitioner any sum on account of fees, one would nevertheless expect petitioner, by a receipt or other document given to Craig, to have indicated the nature of the $17,888.75 deposit of April 29, 1957, yet petitioner gave Craig no receipt. And it appears from petitioner's testimony that his books did not accurately and completely reflect his dealings with the $17,888.75. He testified that his ledger showed the receipt of that sum; "Then it shows a credit of $11,000 originally, which is the $10,000 and the $1,000. Then it shows the disbursements which were made to the Bank of America [$3,293.34]. Then it shows the disbursement that was made on two occasions [$1,000 and $3,000] to Mr. Craig. . . . And then it shows the balance [$10,595.41]," and there

were no other entries in this regard. Before the Board of Governors petitioner's counsel explained his position as follows: "Our point is that initially when the check [$17,888.75] was given to [petitioner] . . . there was an understanding that $10,000 of it was to be used by him as an advance payment on account of fees; and that therefore . . . there is no relationship between the withdrawals [by petitioner from the trustee account] and the value of services, because as a matter of right under the agreement, he could have withdrawn and taken the $10,000 the very day the check was delivered to him. . . . Ultimately you would have to decide whether the value of the services was $100, $10,000, or $20,000. If it was $100, Dreyfus would then owe the man $9,900. . . . If on the other hand it was $20,000, he would owe Dreyfus . . . another $10,000."

Craig's testimony that there was no particular discussion or arrangement as to fees appears to be corroborated by circumstances. Petitioner knew that the Craigs had a "net worth" of $103,000 but were currently involved in business difficulties; petitioner may well have considered it advisable to postpone discussion of fees until he considered the moment more propitious. In this regard petitioner testified, "Where there is a situation where a retainer has been paid and a substantial retainer, but we don't know what the particular outcome will be, whenever the fee is substantial, I usually wait until the conclusion of the matter or a psychological time to do the billing.

"The arrangement that I had with Mr. Craig, to be specific, Mr. Craig had told me on many occasions about the difficult times he was going through [in connection with a number of his corporate clients] . . . . He said that he had had one of the most difficult years he had ever had, and also, he had to take his son out of Stanford, which disappointed him very much, and so on.

"So I did not do any additional billing, or have any discussion about additional fees outside of the retainer."

Petitioner's payments to the Craigs do not fully accord with his own present view of the asserted $11,000 advance for fees and costs. Under such view, when petitioner deposited the $17,888.75, he held only $6,888.75 in safekeeping for the Craigs, yet he paid them a total of $7,293.34, ending with the $3,000 payment of September 8, 1957. Petitioner would have us believe that there was no substantial overpayment because such $3,000 payment represented not only the balance owing

the Craigs but also the return to them of the excess of the $1,000 assertedly advanced for "costs" over petitioner's actual expenditures on their behalf. Petitioner's "Itemization of Expenses" for Craig from March 27 to October 15, 1957, totals only $669.61 rather than the $1,000 which assertedly had been advanced to him for "costs." This "Itemization" was first presented, not to Craig, but to The State Bar in early December 1958, as an exhibit to petitioner's answer to the notice to show cause which had been given by the local administrative committee in this matter in June, 1958. The lack of any record made by petitioner in September, 1957, when he says he returned part of the $1,000 advance for costs, casts doubt on his explanation. On the other hand, the fact that the $3,000 payment in September reduced the trustee account balance to less than $300 lends credence to Craig's evidence that he was asking restitution of the entire amount claimed by him and that petitioner then repaid as much as he was able.

In the circumstances petitioner's use of the term "credit balance" in the instrument of October 14, 1957, and his explanation thereof in his brief, do not impel us to the conclusion that the $10,594.81 (*sic*) was, and was understood by Craig to be, an advance on account of fees and costs, or a retainer, and was not, as the instrument of October 14 further states, "due them [the Craigs]."

As stated, petitioner urges that, if it be determined that grounds for discipline are established, nevertheless the penalty of disbarment is too severe. This was the penalty recommended by the local committee after each of the hearings before it, as well as by a majority of the Board of Governors. Petitioner points to no particular mitigating circumstances but emphasizes that three of the four board members who voted against the recommendation expressed the view that the discipline was too harsh. ██ However, as we have previously had occasion to say, "Misappropriation of funds entrusted to an attorney at law is a gross violation of general morality as well as professional ethics and, in addition, is likely to endanger the confidence of the public in the legal profession. It deserves severe punishment." (*Sturr* v. *State Bar* (1959), 52 Cal.2d 125, 134 [6] [338 P.2d 897]; see also *Pearlin* v. *State Bar* (1941), 18 Cal.2d 682, 684 [117 P.2d 341]; *Stanford* v. *State Bar* (1940), 15 Cal.2d 721, 728 [104 P.2d 635]; *Glover* v. *State Bar* (1939), 13 Cal.2d 229, 234 [88 P.2d 922].)

It is therefore ordered that Charles Dreyfus be disbarred and that his name be stricken from the roll of attorneys of this state, the order to become effective 30 days after the filing of this opinion.