[L.A. No. 29673. In Bank. Apr. 16, 1970.]

JAMES E. MACK, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

## Counsel

James E. Mack, in pro. per., for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

## Opinion

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California that petitioner be suspended from the practice of law for five years on conditions of probation, including actual suspension during the first two years.

Petitioner was admitted to practice in California in 1948. He practiced here until December 1959, at which time he moved to Arizona to engage

in the real estate business. After returning to California in the summer of 1965, he was employed as house counsel by Alpha Beta Acme Markets, Inc. (hereinafter referred to as "Alpha"). That employment continued until March 1, 1966, after which petitioner engaged in private practice.

In the summer of 1966, Alpha retained petitioner to represent it in recovering $1,820, which had been introduced in evidence in a criminal matter. In November 1966, petitioner instituted legal proceedings on behalf of Alpha in the Municipal Court for the Culver Judicial District of Los Angeles County. Subsequently, the Los Angeles Police Department deposited $1,820 with the clerk of the court, as trustee. On July 5, 1967, petitioner obtained an order directing the clerk to pay $1,820 to Alpha, in care of petitioner, its attorney. On July 7, 1967, petitioner notified Alpha by letter that he had obtained the order, and he sent Alpha a statement for fees and costs, totaling $463.26.

On July 18, 1967, the County of Los Angeles issued its warrant for $1,820, payable to petitioner, and delivered it to his office. Upon receipt of the warrant on July 20, 1967, petitioner personally endorsed it. It was deposited in petitioner's trust account at the Bank of America, Hollywood-Highland Branch. The balance in the account immediately prior to the deposit of the warrant was $10.11. After the warrant was deposited on July 20, 1967, the balance was $1,830.11.

Beginning July 21, 1967, petitioner withdrew funds from the trust account without making any remittance to Alpha. Some of the withdrawals were paid to petitioner personally, while others were made to, or for the benefit of, other clients of petitioner. At various times after July 20, 1967, the balance in the trust account was reduced to an amount far less than $1,820. The records of the account show that within 11 days after petitioner had deposited the $1,820 warrant, he had reduced the balance in the account to $42.85; and, despite deposits of over $1,500 in August 1967, the trust account balance had been reduced to $56.86 by August 21, 1967. Petitioner followed the same pattern of deposits and withdrawals on later occasions through February 1968.

Some time after October 1967 but before January 1968, Alpha questioned petitioner with regard to the status of his efforts to obtain the $1,820 on its behalf. On these occasions, petitioner failed to disclose to Alpha that he had received the $1,820 and falsely stated that he had not received the funds. On or about January 25, 1968, Alpha conducted an independent examination and confronted petitioner with its knowledge that he had received the warrant. Alpha then demanded payment of the amount petitioner owed it ($1,346.74 after deduction of petitioner's fees and costs).

On January 25, 1968, the balance in petitioner's trust account was $12.63. Thereafter, on or before February 5, 1968, petitioner deposited a total of $2,847.31 in the trust account. One deposit was for $2,000, representing a check payable to petitioner from another client for moneys owed to petitioner by such client. On February 5, 1968, petitioner gave Alpha a check for $1,346.74 drawn on the trust account, but when Alpha first presented it for payment, it was dishonored "for uncollected funds," because the $2,000 check petitioner had deposited on February 5, 1968, had not been collected. Thereafter, Alpha again presented the check for payment, and it was dishonored for insufficient funds, the $2,000 check having by that time been dishonored by the drawee bank. Thereafter, the balance in petitioner's trust account remained at $607, but as of the date of the trial committee hearing on December 2, 1968, petitioner had made no restitution to Alpha.

The facts showing petitioner's failure to observe the requirements of rule 9 of the Rules of Professional Conduct[1] upon receiving funds belonging to his client, his misappropriation of such funds, and his issuing a check against his trust account with insufficient funds therein to cover the check are undisputed. The only issue presented by the petition for review is the proper degree of discipline, petitioner urging that the disciplinary board "failed to take into account mitigating circumstances established during the period of the transaction involved" and that the degree of penalty recommended by the disciplinary board is "unfair, unjust and unwarranted under all the circumstances."

The burden is on petitioner to show that the disciplinary board's recommendation is erroneous or unlawful. (*Corn* v. *State Bar,* 68 Cal.2d 461, 462 [1] [67 Cal.Rptr. 401, 439 P.2d 313]; *McKinney* v. *State Bar,* 62 Cal.2d 194, 195 [2] [41 Cal.Rptr. 665, 397 P.2d 425].) As will hereinafter appear, however, petitioner has not met this burden.

At the hearing before the trial committee, petitioner attempted to convey the impression that his misappropriation of the funds was unintentional and that his failure to make restitution to Alpha was excusable. He asserted, in substance, that he had assumed the county would pay the $1,820 directly to Alpha; that because of his failure to have adequate records of

[1]Rule 9 of the Rules of Professional Conduct provides: "A member of the State Bar shall not commingle the money or other property of a client with his own; and he shall promptly report to the client the receipt by him of all money and other property belonging to such client. Unless the client otherwise directs in writing, he shall promptly deposit his client's funds in a bank or trust company, authorized to do business in the State of California, in a bank account separate from his own account and clearly designated as 'Clients' Funds Account' or 'Trust Funds Account,' or words of similar import. . . ."

account, he did not know before October 1967 that he had received the $1,820 on behalf of Alpha in July 1967 and had used such funds; that he had never had sufficient funds since that time to repay Alpha; and that Alpha had indicated to him it could afford to lose the sum.

In testifying before the committee, petitioner indicated a belief that the court order had directed that the county make the payment directly to Alpha; and he had implied in a letter to Alpha on July 7, 1967, that payment would be made by the county directly to it. The order, however, which had been prepared by petitioner, specifically directed that payment be made to Alpha in care of petitioner.

Although there was some equivocation in petitioner's testimony as to whether he had personally received the warrant, he admitted that he had personally endorsed it (he identified the endorsed signature as his own) and that his secretary had deposited it in his purported trust account in the ordinary course of business pursuant to his general instructions. Under the circumstances, petitioner's statement that he did not know until October 1967 that the warrant had been received and deposited to his account in July is highly improbable.

As will hereinafter appear, prior to the time petitioner resumed private practice in 1966 he had been made aware of his professional responsibilities in handling trust funds. The evidence shows, however, that, despite this knowledge, petitioner soon after returning to private practice in 1966 used his trust account as a mechanism to hold and disburse funds of two clients free of the claims of certain of their existing creditors, as well as for his personal use.

Petitioner testified that he represented Western Transistor Corporation, which was his largest single client; that the corporation was in financial difficulty and was being constantly subjected to attachments and levies; that he used his trust account for the corporation and one of its officers, who was also in financial difficulty; that he also ran collections on behalf of the corporation through his trust account; that this made it extremely hard for him to balance the account, and he gave up trying to do so[2]; and that he expected to receive substantial fees for permitting the use of his trust account for the business purposes of the corporation and its officer.

[2]Petitioner testified that when he opened his trust account in July 1966, and during the first few months thereafter, he made notations on his check book stubs and attempted to reconcile his bank statements. However, he said: "I started to keep the balance as I started the account. Until there were enough transactions in it particularly with Western Transistor it got confused and I stopped keeping the balance until I picked it up again or attempted to pick it up again in November [1967]."

Although petitioner was the only person authorized to make withdrawals from the account, he maintained no specific ledger sheet or other record to explain his withdrawals or his deposits. He stated that he had no procedure to determine the source of deposits except his own memory and discussion with his secretary. Under the circumstances, petitioner's designation of his bank account as a "trust account" was nothing more than a sham compliance with rule 9. As stated by this court in *Clark* v. *State Bar,* 39 Cal.2d 161, 174 [246 P.2d 1]: ". . . 'The failure to keep proper books . . . is in itself a suspicious circumstance.' "

Although petitioner claims he did not discover until October 1967 that the $1,820 warrant had been deposited to his account in July 1967, he admitted that even after making such discovery in October, he failed to disclose to Alpha his receipt and use of the funds and falsely represented to Alpha that the "judge was giving [him] some trouble"; that he "didn't have the proper order"; and that he "hadn't received the funds." He stated that he "thought" his representations were "obviously an error" and he was not sure whether he acted as "a matter of pride." It is clear, however, that petitioner's acts of deceit did not result from mere error on his part and that he deliberately made such statements to conceal from Alpha his use of its funds.

Petitioner's conduct shows not only a violation of rule 9 but, in addition, bad faith toward his client. (See *Cutler* v. *State Bar,* 71 Cal.2d 241, 250-251 [78 Cal.Rptr. 172, 455 P.2d 108].) Petitioner's deliberately deceiving his client is inexcusable. (*McKinney* v. *State Bar, supra,* 62 Cal.2d 194, 196 [3].)

Petitioner's bad faith toward his client is further shown by his action, or lack of action, with respect to making restitution. At the hearing, petitioner said: "At this point it's true that I have not yet made any restitution to Alpha Beta, I suppose for two reasons. One because of their statement they didn't want the money although they are entitled to it, it's theirs. Secondly, because as of this point yet I have not had $1,346 in one lump sum. And, thirdly, I was waiting for this hearing." Although petitioner claimed he lacked funds with which to make restitution, he admitted that his gross income during 1967 was $31,000 and that his net income was $17,000. He also admitted that he paid all his office overhead, amounting to between $900 and $1,000 per month, and had on hand money for his own purposes exceeding the amount he owed Alpha.

Furthermore, the record shows that, to petitioner's knowledge, Western Transistor Corporation, the client which gave him a $2,000 check, dated

February 2, 1968, deposited by him in his trust account February 5, 1968 (which check, as hereinabove indicated, was dishonored by the drawee bank), was in financial straits[3] and went into receivership two days after petitioner deposited the check. Petitioner nevertheless gave Alpha a check for $1,346.74 in restitution, knowing that if the $2,000 check was not paid, his check to Alpha would be returned for insufficient funds. In view of his close contact with Western Transistor Corporation, however, it is reasonable to assume that petitioner knew the $2,000 check would not likely be paid, and that he issued the $1,346.74 check to Alpha for the purpose of stalling it.

At the hearing before the trial committee, petitioner sought to show as mitigating circumstances the fact that from November 1967 to May 1968 he was having marital difficulties; and the disciplinary board in its findings took cognizance of this claim. It should be noted, however, that petitioner received the funds in July 1967 and almost immediately thereafter misappropriated them and that at least by October 1967, prior to the time he claims his domestic problems arose, he was aware the funds had been received and used by him, and he nevertheless failed to turn over to his client the amount to which it was entitled or to notify his client that he had received the funds.

In any event, petitioner's prior record shows that his misconduct resulted from factors other than his alleged emotional distress because of domestic difficulties. On September 12, 1960, in Bar Miscellaneous 2651 this court suspended petitioner for six months as a result of his misconduct in two matters, one occurring in 1958 and the other in the following year. In the first matter, the Board of Governors found that petitioner in November 1958 had obtained $5,000 in cash and the return of his personal promissory notes for $2,000 and $3,000, respectively, by giving his creditor a $10,200 promissory note, which petitioner had purportedly executed with a comaker, but that petitioner had wrongfully affixed the signature of another to the note as a comaker, without such person's knowledge or authorization. In the second matter, the Board of Governors found that on March 10, 1959, petitioner had received a $2,600 check from his client, to be retained by petitioner as trustee and used in connection with the purchase of certain real property by the client. Petitioner deposited the proceeds of the check in his trust account on March 10, 1959, but immediately withdrew $2,000 and misappropriated it. The real estate transaction was completed in March 1959 except for payment of the funds. On March 27, 1959, petitioner, on behalf of his client, delivered a $3,441 check to the title company, drawn on his trust account; but the check was returned un-

[3]At the time Western Transistor Corporation issued the check February 2, 1968, it had notice from its bank that its account would be closed February 5, 1968.

paid for insufficient funds. In spite of repeated requests by the title company for payment to complete the transaction, petitioner did not make full payment until July 21, 1959, almost four months later. Under the circumstances, it will be seen that petitioner was following a pattern which he had previously established and for which he had previously been disciplined.

Petitioner's action in the present matter is sufficient to warrant the discipline recommended by the disciplinary board even without consideration of his prior record. His prior record, however, may properly be considered in determining the appropriate discipline. (*Eschwig* v. *State Bar,* 1 Cal.3d 8, 18-19 [81 Cal.Rptr. 352, 459 P.2d 904].) In *Bruns* v. *State Bar,* 18 Cal.2d 667, 673 [117 P.2d 327], a disbarment matter, this court stated: "Although ten years have elapsed since the previous disciplinary proceedings against petitioner . . . it is apparent that the discipline then administered did not succeed in imparting to him an understanding of the duties of an attorney to his clients and to the public."

Under the circumstances, further discipline is warranted, and the recommended discipline is lenient in view of the attitude shown by petitioner.

It is ordered that petitioner be suspended from the practice of law for a period of five years on conditions of probation, including actual suspension during the first two years, effective 30 days from the filing of this opinion.