[L.A. No. 30025. In Bank. Feb. 23, 1973.]

NICK N. MRAKICH, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

## COUNSEL

Mohi, Morales, Dumas & Glasman and Frank C. Morales for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Christopher M. Reuss for Respondent.

## OPINION

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar that petitioner be suspended from the practice of law for three years.[1]

Petitioner was admitted to practice in 1957 and has no prior disciplinary record. He seeks to have us reject the board's recommendation and dismiss the proceeding on the grounds that certain findings are not supported by the evidence; that the findings, even if supported by the evidence, "are insufficient to warrant discipline"; and that procedural errors were committed. We have concluded that the evidence supports the findings and warrants the imposition of discipline, that it does not appear that the alleged procedural

---

[1] Eight members so recommended. Two voted "No"; one believed the discipline insufficient; the other, excessive.

The local committee (three members) unanimously recommended that petitioner be suspended for four years and thereafter be "reinstated" only upon proof that he had made restitution to Milomir Milojevic and Florence Miller. The local committee's recommendation was based in part upon its findings relating to the Miller matter, which matter was dismissed by the board.

errors were prejudicial, and that petitioner should be suspended for the period hereinafter specified.

### The Findings

The board adopted the following findings of the local committee: In May 1969 petitioner was retained to represent Milomir Milojevic in connection with the repossession of a truck purportedly wrongfully taken from Milojevic by his son. About May 22, 1969, petitioner repossessed the vehicle and arranged for its sale for $2,600. The following day he received that sum in payment for the vehicle. He failed to notify his client of the receipt of the funds, failed to deposit the money in a trust account, and converted the money to his own use.

### Claim Evidence Does Not Sustain Certain Findings

Petitioner asserts that the findings that he was retained "solely" to represent Milojevic in connection with the repossession of the truck[2] and that he converted the money to his own use are not supported by the evidence.

### The Evidence

In December 1968 Milomir Milojevic, a Yugoslavian immigrant,[3] gave his son Zarco the funds to buy a 1969 Chevrolet truck, which cost about $3,900. Milojevic intended to use the truck at his egg ranch and after the truck was purchased had it registered in the ranch's name. Zarco was not interested in the ranch and about March 1969 stopped working for his father and went to live with his mother, who was separated from his father. When Zarco left, he took the truck with him.

Milojevic testified that he mentioned to Mila and Stena Mitchell (who were friends of his and of petitioner's family) that he had problems running the ranch without the truck and wanted to repossess it. Mrs. Mitchell testified that Milojevic told her about "a problem he had with his family" and said he wanted an attorney's advice. The Mitchells recommended petitioner to Milojevic, and Mrs. Mitchell arranged for petitioner and Milojevic to meet at the Mitchells' home about early May 1969. According to petitioner, Mrs. Mitchell said she had a friend who had problems with "his property and divorce situation" and wanted some advice.

[2]Although the findings do not expressly state that petitioner was retained "solely" for the above purpose, they may be so interpreted. Such an interpretation is in accord with the State Bar's position in its brief.

[3]Milojevic immigrated to the United States in 1952 from Yugoslavia, where he had been a teacher of federal taxation. Despite his 17 years in this country he evidently had difficulty with English, since at the State Bar hearing an interpreter was used.

The evidence is conflicting as to the nature of the agreement entered between Milojevic and petitioner.[4] Milojevic testified: He hired petitioner solely to repossess the truck and paid him $25 for his advice on the matter. He did not seek petitioner's advice regarding any other matter. He did mention to petitioner that Zarco was not "taking care of the business as he should." He also mentioned to petitioner an action he had filed for a divorce, but he did not seek petitioner's advice regarding it since he already had an attorney named Raycraft, who was handling the divorce.[5] Raycraft was also representing him in connection with a joint tenancy problem. Milojevic was not told by petitioner that if he wanted petitioner to represent him in the divorce and property matters he would have to pay a $2,500 retainer, nor did he agree to sell the truck and use the proceeds for petitioner's retainer.

On the other hand, petitioner testified: At the initial meeting he and Milojevic talked generally about the latter's divorce, his desire to regain a one-half interest in property he deeded Zarco, and his family problems. Milojevic showed him various documents including a deed purporting to convey an interest in joint tenancy to Zarco. Milojevic said that he had an attorney who did not speak Yugoslavian and that he wanted petitioner to represent him. Milojevic further stated that he had no money, but, when petitioner inquired regarding assets, Milojevic mentioned the truck. Petitioner said that, if Milojevic wished to retain petitioner, arrangements could be made to repossess the truck and apply the proceeds thereof to petitioner's retainer fee. A few days later he met Milojevic a second time at the Mitchells' home. Milojevic then stated that he wanted to repossess the vehicle and retain petitioner "to represent him in his divorce, his property, his everything, that the repossession was simply incidental and a means to obtain [petitioner's] fee." This second interview was about an hour's duration during which he reviewed Milojevic's legal problems and decided the retainer fee would be $2,500.[6] The attorney's fee agreement and authorization to use the proceeds of the sale of the truck for his own use were solely oral.

---

[4]Their conversation was in Yugoslavian. Petitioner makes no claim that he had any problem conversing in, or understanding, Yugoslavian.

[5]A Yugoslavian attorney named Pendo took Milojevic to Raycraft, who did not speak Yugoslavian. Milojevic denied that he was dissatisfied with Pendo's taking him to Raycraft.

[6]Although at some points in his testimony petitioner stated that the amount of his retainer fee was $2,500 elsewhere in his testimony he indicated that his retainer fee was $2,600. For example, his examination included the following: "Q. And in an hour's time you . . . came to the decision that your retainer would be $2,600? A. $2,500. Q. $2,500? A. Yes. Q. Is that correct? A. Yes. . . . [Q.] And . . . did you demand and did he agree to pay you $2,500 for a retainer fee for that purpose? A. I did not demand, I simply stated that that's what it would be, and it was accept-

Around May 15, 1969, Raymond Varela, a friend of petitioner, at petitioner's request went to see Milojevic regarding the repossession of the truck. Milojevic signed a document entitled "Authority to Repossess" and paid Varela $175 for his services. Varela testified that Milojevic stated that he had hired petitioner to obtain a divorce and had to sell the truck in order to get enough money to pay petitioner for his services. Varela testified that he "assumed" the services were "in connection with the divorce . . . . That's what we were talking about." Milojevic, however, testified that he did not tell Varela that he wanted to sell the truck so that he could pay petitioner's retainer and that he did not recall whether he discussed his divorce problems with Varela.

A few days later Varela told Milojevic on the telephone that the truck had been repossessed. According to Milojevic, he asked Varela to deliver the truck to him. According to Varela, however, Milojevic said not to deliver the truck because his son would get it and Varela promised to store it. Thereafter Varela was told by petitioner that Milojevic wanted to sell the truck.

John Varela, the son of Raymond Varela, learned from his father that the truck was for sale and contacted petitioner. Petitioner told John to ask Milojevic how much he wanted for the truck. On May 21, 1969, petitioner and John went to the ranch to see Milojevic.[7] According to Milojevic, on this occasion petitioner told him "I sold the truck for $2,600 and you will get the cashier's check right now," but no check was given him. According to petitioner, he did not take part in the negotiations between Milojevic and John and never mentioned the cashier's check. Milojevic further testified that he did not want to sell the truck but when petitioner "sold [it]" Milojevic did not know anything to do but agree.

Milojevic accompanied petitioner and John to the Department of Motor Vehicles, where Milojevic signed a contract of sale prepared by petitioner.

able to him . . . ." Elsewhere, however, petitioner's examination included testimony such as the following: "CHAIRMAN DARBY: Now, so I can understand this portion of it as I understand that you received a retainer of some $2,600 on the 22nd of May, 1969, is that correct? A. That's correct."

[7] In a deposition that was introduced into evidence John testified that when he and petitioner went to the ranch he heard petitioner and Milojevic discuss "legal things other than the repossession of the car." When asked what specifically was said, John replied that Milojevic said his son was "no good" and "had tried to cheat" him, that he was not positive what other legal problems were discussed, that the conversation was partly in Yugoslavian, which he did not understand, that he heard "very little on the divorce," and that there was no discussion about any quiet title action that he recalled. He stated he presumed petitioner was Milojevic's attorney from what his father, Raymond Varela, had told him.

The contract states that Milojevic "for the consideration of $2,600 hereby sells his 1969. Chev." to John, that the "buyer is to pay all costs of sale . . ." and that "The full purchase price to be delivered on or before May 22, 1969." Nothing in the contract indicates that the money was assigned to petitioner. Milojevic testified that he did not know "what was written" and signed the document since he then had confidence in petitioner. He thereafter stated, however, that he "knew" what he was signing was a contract of sale and "knows" what such a contract is. According to Milojevic, after the document was executed petitioner looked into his brief case and said that he was sorry, that he must have left the cashier's check in his office, and that Milojevic would receive it the next day. Petitioner denied fumbling in his brief case and saying that he "must have forgotten [the cashier's check] at his office."

The next day, May 22, 1969, John, at petitioner's request, delivered $2,600 in cash to petitioner. John testified he did not recall any discussion about what petitioner would do with the money but presumed petitioner would deliver it to Milojevic. Within the next few days petitioner spent "virtually all" the $2,600 to pay his own bills. He never deposited the funds in a trust account and did not then have such an account.[8]

Milojevic further testified: He did not receive the money on May 23d as promised and tried several times to reach petitioner by telephone but was unsuccessful. He left messages asking petitioner to call him, but petitioner did not do so. On May 26, 1969, he succeeded in reaching petitioner, and petitioner promised to give him the money on Saturday but did not do so.

According to petitioner, around May 26, Milojevic telephoned him and said his services were no longer needed, and during this conversation petitioner advised Milojevic for the first time that he had received the $2,600 and spent the money and would have to raise funds if he were to repay Milojevic. Petitioner stated he tried to call Milojevic on the 23d or 24th but did not reach him.

On May 31, 1969 (Memorial Day), petitioner met Milojevic again at the Mitchells' home and they proceeded to petitioner's home. Milojevic demanded "[his] money" and petitioner replied that the banks were closed but he would try to get some for Milojevic the following week.

Around June 2, 1969, petitioner asked the Mitchells to deliver to Milojevic an envelope containing $900, and they declined to accept the money and told him to deal directly with Milojevic. Petitioner did not thereafter

---

[8]In May 1969 petitioner used his home as his office. He had been ill and was not then practicing full time.

try to deliver the $900 to Milojevic. According to petitioner, Milojevic told him "he would not accept partial payment." At the time of the local committee hearing (1970) Milojevic had not received the $2,600, and the record does not reveal that he thereafter received any of the $2,600.

Petitioner testified that, although legally he might not have to reimburse Milojevic, he felt he was morally obligated to pay a partial refund of $1,500 to Milojevic. According to petitioner, his moral obligation was based on the fact he had only three conferences with Milojevic and had done only around four hours of research, which research related to the quiet title action. At the hearing he produced his file for Milojevic. The file contained no research notes relating to Milojevic's legal problems. Petitioner testified he had not been able to locate those notes.

### Whether Evidence Sustains Findings

With respect to the scope of our review, it is settled that " 'Findings by the local committee and the Disciplinary Board are not binding on this court, and we will weigh the evidence and pass upon its sufficiency. All reasonable doubts will be resolved in favor of the accused and if equally reasonable inferences may be drawn from a proven fact, the inference which leads to a conclusion of innocence rather than one leading to a conclusion of guilt will be accepted. [Citations.]

" 'The findings, however, must be given great weight, and "When the findings . . . rest primarily on testimonial evidence, we are reluctant to reverse the decision of the local administrative committee, which was in a better position to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony. [Citations.]" [Citations.] The burden is on the petitioner to show that the findings are not supported by the evidence or that the recommendation is erroneous. [Citations.] In meeting this burden, the petitioner must demonstrate that the charges of unprofessional conduct are not sustained by convincing proof and to a reasonable certainty. [Citations.]' " (*Black* v. *State Bar,* 7 Cal.3d 676, 683-684 [103 Cal.Rptr. 288, 499 P.2d 968], quoting from *Himmel* v. *State Bar,* 4 Cal.3d 786, 793-794 [94 Cal.Rptr. 825, 484 P.2d 993].)

■ We are satisfied that here petitioner has not sustained his burden of showing that the findings are not supported by the evidence. He admittedly used "virtually all" the $2,600 proceeds of the sale of the truck to pay his own bills and admittedly did not have written authority to do so. The contract of sale, which petitioner drafted, significantly did not contain an assignment of the proceeds to him. He claimed he had oral authority from Milojevic to use the proceeds or $2,500 thereof as payment of his retainer

fee,[9] but Milojevic denied giving such authorization. According to petitioner, the authorization was given at a second meeting during early May at the home of Mrs. Mitchell. She denied there was a second meeting at her house in early May. Petitioner's request that the buyer deliver the $2,600 to him in the form of cash is a further suspicious circumstance.

At least if Milojevic retained petitioner solely in connection with repossession of the truck it is inconceivable that he would have authorized petitioner to keep all or most of the proceeds from the sale of the truck as a fee. Petitioner argues that the evidence "overwhelmingly demonstrates" that an attorney-client relationship was established for all purposes between himself and Milojevic. Petitioner so testified, and in support of his testimony he points to (1) evidence of Milojevic's disclosure to him of Milojevic's legal problems and facts relating thereto; (2) Raymond Varela's testimony that Milojevic said he had hired petitioner to obtain a divorce and had to sell the truck in order to get enough money to pay petitioner for his services; and (3) the asserted absence of an agreement between Milojevic and petitioner as to "what attorney's fees would be paid [petitioner] for his advice and repossession and the sale of the . . . truck."

The mere fact that Milojevic may have disclosed to petitioner legal problems other than the repossession of the truck and facts relating to those problems, however, does not require a determination that Milojevic retained petitioner to represent him in those matters. Insofar as Varela's foregoing testimony is concerned, the facts testified to were disputed. Milojevic denied telling Varela that he wanted to sell the truck so that he could pay petitioner and further stated that he had not sought petitioner's advice regarding the divorce. It also appears that Varela was a friend of petitioner and had done repossession and investigative work for him. With respect to the third matter, Milojevic paid petitioner $25 for his advice "that this was [Milojevic's] pickup and [petitioner] will take it away from" Zarco and paid $175 to Varela to repossess the truck. Also, Milojevic testified that petitioner told him (1) he would get $2,600 cash and (2) petitioner "got already [his] fee," and Milojevic testified he thought, but was not certain, that the truck was sold for over $2,600 and petitioner took the amount over $2,600 as his fee.

Milojevic repeatedly and consistently testified that he hired petitioner solely to represent him in connection with the repossession of the truck, and from the findings it may be inferred that the local committee believed Milojevic was telling the truth.

---

[9] Under one of petitioner's versions, namely that the agreed amount of his retainer fee was $2,500, it appears that he converted some of his client's funds, since he admittedly spent "virtually all" the $2,600 for his own purposes and offered no explanation for his expenditure of funds in excess of $2,500.

We conclude that the matters pointed to by petitioner do not warrant our rejecting the local committee's findings, which were adopted by the board. The local committee was in a better position than this court to resolve the conflicting testimony. (See *Himmel* v. *State Bar, supra,* 4 Cal.3d 786, 797.) There was a marked absence of documentary corroboration in support of petitioner's assertions.

### Claim That Findings Are Insufficient to Warrant Discipline

█ Petitioner claims that since there is no finding that the conversion was wilful and knowing, the findings do not show there was moral turpitude on his part and are therefore insufficient to warrant discipline. He asserts that even if Milojevic's understanding of the agreement was contrary to his own, he "cannot be accused of turpitude if he in good faith believed that the proceeds of the sale of the truck was [*sic*] his retainer."

The findings of the board are not binding on us, and we are empowered to review the record as a whole. (*Arden* v. *State Bar,* 52 Cal.2d 310, 315-316 [341 P.2d 6].) There can be no doubt that the wilful misappropriation of trust funds involves moral turpitude (see, e.g., *Johnstone* v. *State Bar,* 64 Cal.2d 153, 155-156 [49 Cal.Rptr. 97, 410 P.2d 617]; *Dreyfus* v. *State Bar,* 54 Cal.2d 799, 800, 804 [8 Cal.Rptr. 469, 356 P.2d 213]; *Resner* v. *State Bar,* 53 Cal.2d 605, 612 [2 Cal.Rptr. 461, 349 P.2d 67]), and the heretofore recited evidence constitutes convincing proof that the misappropriation by petitioner was wilful. Among other things, his inconsistent accounts of the retainer agreement (see fn. 6 herein) suggest that he was not acting in a good faith belief that the proceeds of the sale were his retainer, and his action, or inaction, with respect to restitution is an additional indication of his lack of good faith. (See *Mack* v. *State Bar,* 2 Cal.3d 440, 445 [85 Cal.Rptr. 625, 467 P.2d 225].) Although he claimed that Milojevic told him that Milojevic would not accept partial payment, he admittedly made no attempt to deliver the $900 to Milojevic after the Mitchells declined to accept that sum for delivery to Milojevic.

### Asserted Procedural Errors

Petitioner further contends, without citation of authority, that it was a denial of due process to consolidate for hearing the Milojevic matter and an unrelated charge involving a Florence Miller, The two matters were commenced by separate notices to show cause but were consolidated for hearing under rule 27, Rules of Procedure of the State Bar.[10] An objection

[10]Rule 27 provides: "Any number of acts or omissions or transactions alleged to constitute misconduct by a member may be set forth in the same notice to show cause. . . . *When two or more notices to show cause are issued directed to the*

by petitioner to the consolidation was overruled by the local committee. The local committee found petitioner guilty of misconduct in both matters. The board, however, dismissed the Miller matter and found petitioner culpable only in the Milojevic matter.

In *Black* v. *State Bar, supra,* 7 Cal.3d 676, wherein the petitioner complained it was a denial of due process to consolidate for hearing two unrelated accusations, we stated that it did not appear he had been prejudiced by the consolidation since the board dismissed one of the matters pursuant to the local committee's recommendation. *Coviello* v. *State Bar,* 41 Cal.2d 273, 275-276 [259 P.2d 7], held that the petitioner could not successfully complain that it was improper to join two unrelated counts where he made no objection before the local committee and there was nothing indicating he was prejudiced by the joinder.

Here, unlike *Black,* the local committee did not recommend dismissal of one of the matters and, unlike *Coviello,* an objection was made before the local committee. ■ However, in that objection and the petition for review petitioner did not point to any matter supporting his conclusion that he was prejudiced by the consolidation.[11] Under the circumstances his contention that he was denied due process by the consolidation cannot be upheld.

■ ■ The local committee did not file its findings, conclusions, and recommendation with the State Bar until nearly nine months after the expiration of the time specified in rule 34, Rules of Procedure of the State Bar. Petitioner asserts that the committee's failure to comply with rule 34 constituted an irregularity. However, he points to nothing indicating he was prejudiced thereby, and it is settled that compliance with rule 34 is nonjurisdictional. (Rule 20(a), Rules of Procedure of the State Bar; *Reznik* v. *State Bar,* 1 Cal.3d 198, 204 [81 Cal.Rptr. 769, 460 P.2d 969, 40 A.L.R. 3d 161]; *Arden* v. *State Bar, supra,* 52 Cal.2d 310, 316.) Under the circumstances the fact that the committee did not comply with rule 34 does not warrant our rejecting the board's recommendation.

*same member the hearings thereon may be consolidated at any stage in the proceeding by the committee or the board when, in the judgment of the committee or the board, no substantial rights of the member will be prejudiced thereby."* (Italics added.)

[11]The petition contains statements such as that in the Milojevic matter "the Committee chose to resolve the conflict [in the evidence] in favor of the complaining witness undoubtedly influenced by its previous finding of unprofessional conduct and turpitude in the Miller matter." However, we cannot assume that the committee was so influenced.

*Discipline*

This court has declared that "The misappropriation of a client's funds, in the absence of clearly extenuating circumstances, warrants disbarment. (*In re Freiburghouse,* 52 Cal.2d 514, 516 . . . .)" (*Simmons* v. *State Bar,* 70 Cal.2d 361, 366 [74 Cal.Rptr. 915, 450 P.2d 291].) *Simmons,* however, further stated that in that case there were "no clearly extenuating circumstances" and nevertheless did not disbar the attorney but followed the board's recommendation of four years suspension on conditions of probation including two years actual suspension. In *Simmons* the attorney misappropriated a client's funds, failed to observe rule 9 of the Rules of Professional Conduct regarding the handling of trust funds, demonstrated a "complete lack of candor" in his testimony, did not make restitution until the time of the local committee hearing, and had a prior disciplinary record for misappropriation of a client's funds. (See also *Mack* v. *State Bar, supra,* 2 Cal.3d 440.)

*Yapp* v. *State Bar,* 62 Cal.2d 809 [44 Cal.Rptr. 593, 402 P.2d 361]. suspended the attorney for three years on conditions of probation including actual suspension for 90 days where the attorney misappropriated trust funds and made misrepresentations but there were extenuating circumstances (e.g., no prior disciplinary record and money was eventually repaid). As noted in *Yapp* (at p. 819), "there is no conformity as to punishment ascertainable from the cases. Each case must be decided on its own facts."

Petitioner had no prior disciplinary record during the 16 years he has been a member of the State Bar. Although his misconduct in the instant case is serious and cannot be condoned, we are of the opinion that under the circumstances here appearing the discipline hereinafter ordered is adequate.

▪ It is ordered that petitioner be suspended from the practice of law for one year and until he makes restitution of $2,600 to Milojevic and presents satisfactory proof thereof to the State Bar, but in no event for more than three years. This order is effective 30 days after the filing of this opinion.

Petitioner's application for a rehearing was denied March 29, 1973.